CAMBODIAN BUDDHIST SOCIETY OF
CONNECTICUT, INC., ET AL.
*v.* PLANNING AND ZONING
COMMISSION OF THE
TOWN OF NEWTOWN
(SC 17690)

Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued March 6, 2007—officially released February 12, 2008

*Michael A. Zizka*, with whom was *Aimee L. Hoben*, for the appellant (plaintiffs).

*Robert A. Fuller*, with whom, on the brief, was *Karen A. Stansbury*, for the appellee (named defendant).

*Thomas W. Beecher*, for the appellees (intervening defendant Richard T. Coburn et al.).

*Charles D. Ray, Anthony R. Picarello, Jr., Derek L. Gaubatz* and *Lori E. Halstead* filed a brief for the Becket Fund for Religious Liberty as amicus curiae.

*Opinion*

PALMER, J. This appeal by the named plaintiff, Cambodian Buddhist Society of Connecticut, Inc. (society), and the plaintiff Pong Me, the society's president, arises from the decision of the defendant planning and zoning commission of the town of Newtown (commission) denying the society's application for a special exception to build a Buddhist temple on its property located in the town of Newtown (town). The plaintiffs appealed from the commission's decision to the trial court, claiming that the reasons for the denial were not supported by the record and that the denial violated General Statutes § 52-571b[1] and the federal Religious Land Use and Insti-

---

[1] General Statutes § 52-571b provides in relevant part: "(a) The state or any political subdivision of the state shall not burden a person's exercise of religion under section 3 of article first of the Constitution of the state even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

"(b) The state or any political subdivision of the state may burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental

tutionalized Persons Act of 2000, 42 U.S.C. § 2000cc et seq. (RLUIPA).[2] The trial court dismissed Me's appeal for lack of standing and denied the society's appeal on the merits. On appeal to this court,[3] Me challenges the trial court's conclusion that he does not have standing to bring this action, and the society and Me contend

interest, and (2) is the least restrictive means of furthering that compelling governmental interest. . . ."

[2] Title 42 of the United States Code, § 2000cc, provides in relevant part:

"(a) Substantial burdens

"(1) General rule

"No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—

"(A) is in furtherance of a compelling governmental interest; and

"(B) is the least restrictive means of furthering that compelling governmental interest.

"(2) Scope of application

"This subsection applies in any case in which—

* * *

"(C) the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved.

"(b) Discrimination and exclusion

"(1) Equal terms

"No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.

"(2) Nondiscrimination

"No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination.

"(3) Exclusions and limits

"No government shall impose or implement a land use regulation that—

"(A) totally excludes religious assemblies from a jurisdiction; or

"(B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction." 42 U.S.C. § 2000cc (2000).

[3] The Appellate Court granted the plaintiffs' petition for certification to appeal from the judgment of the trial court; see General Statutes § 8-9; and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

that the trial court incorrectly determined that the commission's denial of the society's application was supported by substantial evidence and did not violate either RLUIPA or § 52-571b. We conclude that (1) the trial court properly dismissed Me's claims for lack of standing, (2) neither RLUIPA nor § 52-571b is applicable to the present case, and (3) the commission's decision to deny the society's application for a special exception was supported by substantial evidence. Accordingly, we affirm the judgment of the trial court.

The record reveals the following facts and procedural history. In 1999, the society purchased a ten acre lot on Boggs Hill Road in Newtown, containing two acres of wetlands and a three acre pond. Four Buddhist monks resided on the property at that time. The property is located in a farming and residential zone in which the operation of places of religious worship is permitted by special exception. On August 15, 2002, the society submitted to the commission an application for a special exception to construct a 6000 square foot meditation temple and meeting hall on the property. The application indicated that off-street parking for approximately 100 vehicles would be required for the proposed temple.

The commission conducted public hearings on the application on October 17 and December 9, 2002. At its regular meeting on February 20, 2003, the commission voted to disapprove the society's application for a special exception on the ground that it did not comply with the standards and criteria set forth in the governing zoning regulations. After noting that the application had been revised to reflect a 7618 square foot building, including a 1618 square foot meditation temple and a 6000 square foot meeting hall, with 148 parking places to accommodate 450 society members at five major Buddhist festivals annually, the commission concluded

that the proposed use was inconsistent with a "quiet single-family residential neighborhood with a rural setting" and, therefore, did not meet § 8.04.710 of the Newtown zoning regulations (regulations), which requires that the "[t]he proposed use shall be in harmony with the general character of the neighborhood."

The commission also noted that a newspaper article presented at the hearings revealed that the United States Department of Commerce had awarded a grant to an entity known as Khmer Health Advocates for three health treatment facilities, one of which was reported to be located on the society's property. The commission indicated that it was not convinced by the society's representations that it did not intend to use the site for health treatment purposes. Because that use was not permitted in a residential zone, it did not meet § 8.04.720 of the regulations, which requires that "[t]he proposed use shall not be inconsistent with the intent and purpose of [the] regulations."

The commission also determined that, contrary to the society's estimate, the increase in traffic volume at the site during peak use would be 100 to 200 percent over existing traffic volume. Accordingly, the commission concluded that the proposed use was not in conformity with the requirement of § 8.04.740 of the regulations that "[t]he proposed use . . . not create additional congestion or a traffic hazard on existing streets." In addition, the commission determined that the increase in traffic congestion, as well as the traditional Buddhist design of the proposed temple, was inconsistent with § 8.04.730 of the regulations, which provides that "[t]he proposed use shall not substantially impair property values in the neighborhood." The commission further concluded that the temple design was not in compliance with the provision of § 8.04.770 of the regulations that "[t]he architectural design of the proposed

buildings shall be in harmony with the design of other buildings" in the neighborhood.

Finally, the commission concluded that the society had not established that the proposed septic system and water supply system complied with the state public health code. Accordingly, the proposed use did not meet § 8.04.750 of the regulations, which provides that "[t]he proposed use shall not create a health or safety hazard to persons or property on or off the lot on which the use is proposed." Following its vote to disapprove the society's application, the commission stated that it believed that "[a]pproval of the application [would have been] a disservice to the Buddhists because they could not use the property the way they wished to." The commission also stated that "[d]iversity of religion should be encouraged in Newtown," and expressed the "[hope] that the [society] could find property more suitable to [its] needs."

The plaintiffs appealed from the adverse decision of the commission to the Superior Court pursuant to General Statutes § 8-8. They alleged in a five count complaint that the commission's decision was arbitrary, illegal and an abuse of discretion because (1) the reasons for the decision were not supported by the record (first count), (2) the decision violated § 52-571b (second count), (3) the decision violated RLUIPA (third count), (4) as applied, the regulations were not in furtherance of a compelling governmental interest and were not the least restrictive means of furthering a governmental interest and, therefore, were in violation of RLUIPA (fourth count), and (5) as applied, the regulations were not in furtherance of a compelling governmental interest and were not the least restrictive means of furthering a governmental interest and, therefore, were in violation of § 52-571b (fifth count). Thereafter, several owners of property abutting and within 100 feet of the society's

property filed a motion to intervene as defendants in the appeal, which the court, *J. R. Downey, J.*, granted.[4]

The commission filed a motion to dismiss Me's claims on the ground that he had no property interest in the property and, therefore, lacked standing to bring a zoning appeal. The trial court, *J. R. Downey, J.*, granted the motion.[5] The commission also filed a motion to strike (1) the second count of the complaint, contending that the society did not have a cause of action under § 52-571b because the statute protects only individual rights, (2) the second, third, fourth and fifth counts because claims pursuant to § 52-571b and RLUIPA cannot be joined in a zoning appeal, and (3) the fourth and fifth counts because neither § 52-571b nor RLUIPA exempts religious uses from zoning regulations or authorizes the invalidation of such regulations. The trial court, *J. R. Downey, J.*, granted the motion to strike as to the fourth and fifth counts on the ground that those counts were duplicative of the second and third counts and denied the remaining portions of the motion to strike. Thereafter, the society revised its complaint in conformance with the trial court's rulings on the motions to dismiss and to strike.

The trial court, *Frankel, J.*, conducted an evidentiary hearing on the society's zoning appeal on June 15, 2005. Me testified at the hearing that the society currently had no temple in the state of Connecticut at which its members could worship. He further testified that the society had purchased the property in Newtown because that property possessed the appropriate quali-

[4] The intervening defendants are Richard T. Coburn, Jeannette Coburn, William Leibold, Patricia Ashbahian, Janis Opdahl, Stuart Opdahl, Anthony J. Russo and Christina C. Russo.

[5] The trial court did not issue a written memorandum of decision on the commission's motion to dismiss. At oral argument on the motion, the trial court stated that it had granted the motion as to Me for the reasons set forth in the commission's brief.

ties for a temple. Pinith Mar, a member of the society and Me's son-in-law, testified that, because the society had no temple, it had been required to hold religious services in a rented space. Bruce Blair, a member of the society, testified that it is essential to Cambodian Buddhism that monks live in the temple and that the practitioners be able to visit the temple where the monks live. It also is important that the temple be located in a tranquil environment where the practitioners can enter into a meditative state. Blair further testified that the older generation of Cambodian Buddhists is dying without being able to introduce the youngest generation to the religion, and if much more time passes before the society is able to build a temple, there might be no need for one.

In its posttrial brief to the trial court, the society contended that, under these circumstances, the commission's denial of the application for a special exception to build the temple substantially burdened the society's exercise of religion within the meaning of § 52-571b and RLUIPA. The society further contended that the denial violated those statutes because it served no compelling government interest and, even if it did, denying the application was not the least restrictive means of furthering that interest. The commission responded that, because the society had not established that it was unable to construct a temple at another location within the town, and because the commission had applied the same standards to the society's application that it would have applied to any applicant for a special exception, the society had failed to establish that its exercise of religion had been substantially burdened under RLUIPA or burdened under § 52-571b.

The trial court agreed with the commission that, in the absence of evidence demonstrating that the society was precluded from building a temple on other sites within the town or that the commission would not have

imposed the same health and safety standards on other applicants, the denial of the society's application did not constitute a substantial burden on its exercise of religion under RLUIPA or a burden under § 52-571b. The trial court also concluded, however, that, under the traditional standard of review for appeals from zoning decisions, there was insufficient evidence to support the commission's determination that the society's proposed use of the property did not meet the requirements of §§ 8.04.710, 8.04.720, 8.04.730 and 8.04.770 of the regulations because the design of the proposed temple was not consistent with the other buildings in the neighborhood. In addition, the court concluded that the commission's determination that the proposed use did not meet the excessive traffic provisions of § 8.04.740 was based on mere speculation.

With respect to the commission's determination that the proposed use did not meet the requirements of § 8.04.750 of the regulations, however, the court determined that it was within the commission's discretion to deny the application because the society had failed to obtain approval of its septic and water supply systems. Accordingly, the court concluded that the commission had not acted illegally, arbitrarily or in abuse of its discretion in denying the application and denied the society's appeal.

This appeal followed. On appeal, Me contends that the trial court improperly dismissed his claims for lack of standing. In addition, Me and the society claim that the trial court incorrectly concluded that the commission's denial of the society's application for a special exception (1) did not constitute a substantial burden on their exercise of religion under RLUIPA,[6] (2) did not

---

[6] The Becket Fund for Religious Liberty filed an amicus brief, also contending that the commission's decision constituted a substantial burden on the plaintiffs' exercise of religion under RLUIPA.

constitute a burden on the exercise of religion under § 52-571b, and (3) was supported by substantial evidence, namely, that the society had not obtained approval of its septic and water supply systems. The commission and the intervenors dispute these claims. The commission also claims, as alternate grounds for affirmance, that the traffic conditions at and near the society's property justified the commission's denial of the application and that the society lacked standing to bring a claim under § 52-571b because that statute protects only individual rights.

We conclude that the trial court properly dismissed the action as to Me. We further conclude that the court correctly determined that the society had standing to bring a claim under § 52-571b. With respect to the society's claims that the commission's decision violated RLUIPA and § 52-571b, we conclude that those statutory provisions do not apply under the circumstances of this case. Finally, we conclude that, under the standard of review applicable to traditional zoning appeals, there was substantial evidence to support the commission's denial of the society's application, and, therefore, the trial court properly denied the society's appeal.

I

We first address Me's contention that the trial court improperly dismissed his claims on the ground that he lacked standing to bring a zoning appeal related to the society's property. Me contends that, because the commission's decision affected the exercise of his religious beliefs, he had an interest that fell within the zone of interests protected by RLUIPA and § 52-571b that was adversely affected by the commission's decision, and, therefore, he was aggrieved. The commission asserts that the court correctly determined that Me was not statutorily aggrieved by the commission's denial of the society's application for a special exception within

the meaning of General Statutes § 8-8 (a) (1)[7] because he did not own the property and did not own land abutting or within 100 feet of the property. The commission further maintains that Me was not classically aggrieved because he had no specific personal or legal interest that was directly and injuriously affected by the commission's decision. We agree with the commission.

"Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he [or she] has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. . . . When standing is put in issue, the question is whether the person whose standing is challenged is a proper party to request an adjudication of the issue . . . . Standing requires no more than a colorable claim of injury; a [party] ordinarily establishes . . . standing by allegations of injury. Similarly, standing exists to attempt to vindicate arguably protected interests. . . .

"Standing is established by showing that the party claiming it is authorized by statute to bring an action, in other words, statutorily aggrieved, or is classically aggrieved." (Internal quotation marks omitted.) *Wesley* v. *Schaller Subaru, Inc.*, 277 Conn. 526, 538, 893 A.2d 389 (2006). "[Statutory] [s]tanding concerns the question [of] whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or consti-

---

[7] General Statutes § 8-8 (a) provides in relevant part: "(1) 'Aggrieved person' means a person aggrieved by a decision of a board and includes any officer, department, board or bureau of the municipality charged with enforcement of any order, requirement or decision of the board. In the case of a decision by a zoning commission, planning commission, combined planning and zoning commission or zoning board of appeals, 'aggrieved person' includes any person owning land that abuts or is within a radius of one hundred feet of any portion of the land involved in the decision of the board. . . ."

tutional guarantee in question. . . . [See] *State* v. *Pierson*, 208 Conn. 683, 687, 546 A.2d 268 (1988), cert. denied, 489 U.S. 1016, 109 S. Ct. 1131, 103 L. Ed. 2d 193 (1989) (standing merely requires the party to make allegations of a colorable claim of injury to an interest which is arguably protected or regulated by the statute or constitutional guarantee) . . . . *Med-Trans of Connecticut, Inc.* v. *Dept. of Public Health & Addiction Services*, 242 Conn. 152, 160, 699 A.2d 142 (1997); see also *United Cable Television Services Corp.* v. *Dept. of Public Utility Control*, 235 Conn. 334, 344–45, 663 A.2d 1011 (1995) (in considering whether a plaintiff's interest has been injuriously affected . . . we have looked to whether the injury he complains of [*his* aggrievement, or the adverse effect *upon him*] falls within the zone of interests sought to be protected . . .)." (Emphasis in original; internal quotation marks omitted.) *Broadnax* v. *New Haven*, 270 Conn. 133, 154–55, 851 A.2d 1113 (2004).

"The fundamental test for determining [classical] aggrievement encompasses a well-settled twofold determination: [F]irst, the party claiming aggrievement must successfully demonstrate a specific, personal and legal interest in [the challenged action], as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the [challenged action]. . . . Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." (Citation omitted; internal quotation marks omitted.) *Eder Bros., Inc.* v. *Wine Merchants of Connecticut, Inc.*, 275 Conn. 363, 369–70, 880 A.2d 138 (2005).

"[I]f the injuries claimed by the plaintiff are remote, indirect or derivative with respect to the defendant's conduct, the plaintiff is not the proper party to assert them and lacks standing to do so. [When], for example, the harms asserted to have been suffered directly by a plaintiff are in reality derivative of injuries to a third party, the injuries are not direct but are indirect, and the plaintiff has no standing to assert them." *Ganim* v. *Smith & Wesson Corp.*, 258 Conn. 313, 347–48, 780 A.2d 98 (2001).

"If a party is found to lack standing, the court is without subject matter jurisdiction to determine the cause. . . . Because standing implicates the court's subject matter jurisdiction, the plaintiff ultimately bears the burden of establishing standing. . . . Furthermore, [a] trial court's determination that it lacks subject matter jurisdiction because of a plaintiff's lack of standing is a conclusion of law that is subject to plenary review on appeal." (Citations omitted; internal quotation marks omitted.) *Seymour* v. *Region One Board of Education*, 274 Conn. 92, 104, 874 A.2d 742, cert. denied, 546 U.S. 1016, 126 S. Ct. 659, 163 L. Ed. 2d 526 (2005).

As a preliminary matter, we address the commission's contention that Me lacked standing both to bring a zoning appeal on the ground that the commission's decision violated RLUIPA and § 52-571b and to bring an independent action invoking those statutes. The commission maintains that Me lacked standing to raise such independent claims because, as a matter of law, "there is an insufficient causal connection between the claim of individual members of a religious society under the state and federal statutes and the denial of a zoning application of a religious society of which they are members." The commission further contends that "the mere fact that the society cannot build a temple on the [property] . . . does not preclude . . . Me from practicing his religion."

We agree with the commission that, under the circumstances of this case, Me lacked standing to assert a claim under § 52-571b because his claim is entirely derivative of the society's claim as the owner of the property. The interest in building a temple on the property is essentially a property interest. Although the commission's decision might have ramifications for the individual members of the society and the circumstances under which they practice their religion, the right to build the temple could not be asserted independently by an individual member. If the society chose not to appeal from the commission's denial of the society's application for a special exception, then any independent challenge by Me pursuant to § 52-571b would be subject to dismissal as moot. On the other hand, because the society has chosen to appeal from the commission's decision on the basis of that decision's alleged violation of § 52-571b, Me's rights under the statute will be protected adequately without his participation.[8] It is clear, therefore, that, because any injuries that Me suffered as a result of the commission's decision "are in reality derivative of injuries to [the society], the injuries are not direct but are indirect, and [he] has no standing to assert them." *Ganim* v. *Smith & Wesson Corp.*, supra, 258 Conn. 348.

For the same reasons, we conclude that Me lacked standing to assert a claim under RLUIPA. Indeed, that statute expressly recognizes that only persons with a property interest in the subject property are proper parties to an action challenging the application of a zoning regulation. RLUIPA provides in relevant part that "[n]o government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person . . . ." 42 U.S.C. § 2000cc (a) (1) (2000). "Land use regulation"

---

[8] We conclude in part II of this opinion that the society has standing to raise a claim under § 52-571b.

is defined in 42 U.S.C. § 2000cc-5 (5) as "a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), *if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land* or a contract or option to acquire such an interest." (Emphasis added.) "Claimant" is defined in 42 U.S.C. § 2000cc-5 (1) as "a person raising a claim or defense under [RLUIPA]."

Me acknowledges that this language "appear[s] to tie standing to a legal interest in property affected by a land use regulation" but notes that a number of federal courts have entertained claims challenging the application of land use regulations that were brought by individuals who had no property interest in the subject property. See, e.g., *Congregation Kol Ami* v. *Abington Township*, 309 F.3d 120, 124 (3d Cir. 2002) (congregation that had entered into agreement to purchase property and rabbi brought action challenging zoning decision affecting property under RLUIPA); *Cathedral Church of the Intercessor* v. *Malverne*, Docket No. CV 02-2989, 2006 U.S. Dist. LEXIS 12842, *3 (E.D.N.Y. March 6, 2006) (landowning church, officers of church and member of church brought action challenging application of land use regulation under RLUIPA). We do not find these cases to be pertinent authority because the issue of whether the nonlandowning plaintiffs in those cases had standing to assert a claim under RLUIPA was not raised.

It necessarily follows from our conclusion that Me lacked standing to bring independent actions pursuant to § 52-571b and RLUIPA, and that he lacked standing to bring a zoning appeal challenging the commission's decision as violating those statutes. He was neither statutorily aggrieved within the meaning of § 8-8 (a) (1)

nor classically aggrieved by the commission's decision.[9] Accordingly, the trial court properly dismissed Me's claims for lack of standing.

II

We next address the commission's alternate ground for partial affirmance that the society lacked standing to bring a claim under § 52-571b.[10] The commission contends that that statute was intended to protect the rights guaranteed by article first, § 3, of the Connecticut constitution, which, by its plain terms, applies only to individual rights. We disagree.[11]

We turn first to the text of the relevant statutory and constitutional provisions. General Statutes § 52-571b

[9] Me relies on several cases in which this court and the Appellate Court have concluded that nonowners of property can have a sufficient interest in the property to have standing to appeal from a zoning decision affecting the property. See, e.g., *Moutinho* v. *Planning & Zoning Commission*, 278 Conn. 660, 669–70, 899 A.2d 26 (2006) (developer that had oral agreement with landowner to enter into long-term lease had sufficient interest in property to appeal from zoning decision affecting property); *Primerica* v. *Planning & Zoning Commission*, 211 Conn. 85, 94–95, 558 A.2d 646 (1989) (lessee has sufficient interest in property to appeal from zoning decision affecting property); *DiBonaventura* v. *Zoning Board of Appeals*, 24 Conn. App. 369, 376–77, 588 A.2d 244 (informal agreement between landowner and landowner's son allowing son to use property for car dealership created sufficient interest in property to allow son to appeal from zoning decision affecting property), cert. denied, 219 Conn. 903, 593 A.2d 129 (1991). These cases are distinguishable from the present case, however, because they involved long-term agreements between the landowner and the nonlandowner concerning the nonlandowner's commercial use of the property that arguably gave rise to a property interest. It is undisputed that Me had no traditional property interest in the society's property.

[10] "Ordinarily, we would consider [a] defendant's alternate grounds for affirmance only after finding merit in . . . the [claim] raised on appeal. [O]nce the question of lack of jurisdiction of a court is raised, [however, it] must be disposed of no matter in what form it is presented . . . and the court must fully resolve it before proceeding further with the case." (Internal quotation marks omitted.) *Dow & Condon, Inc.* v. *Brookfield Development Corp.*, 266 Conn. 572, 578–79, 833 A.2d 908 (2003).

[11] We note, preliminarily, that the scope of the constitutional right protected by § 52-571b is a question of law over which our review is plenary. Cf. *State* v. *Brown*, 279 Conn. 493, 516, 903 A.2d 169 (2006).

(a) provides in relevant part: "The state or any political subdivision of the state shall not burden a person's exercise of religion under section 3 of article first of the Constitution of the state . . . ." Article first, § 3, of the Connecticut constitution provides in relevant part: "The exercise and enjoyment of religious profession and worship, without discrimination, shall forever be free to all persons in the state . . . ."

The commission has not cited to any authority to support its contention that this constitutional provision protects only individual rights, and not the rights of religious institutions, and we cannot perceive any reason to interpret the provision so narrowly. Rather, it is apparent to us that "a [religious] community represents an ongoing tradition of shared beliefs, an organic entity not reducible to a mere aggregation of individuals." *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints* v. *Amos*, 483 U.S. 327, 342, 107 S. Ct. 2862, 97 L. Ed. 2d 273 (1987) (Brennan, J., concurring). "Solicitude for a church's ability to [engage in activities in furtherance of its religious mission] . . . reflects the idea that furtherance of the autonomy of religious organizations often furthers individual religious freedom as well." Id. (Brennan, J., concurring). Accordingly, "religious organizations . . . must be protected by the [free exercise] clause [of the first amendment to the United States constitution]."[12] Id., 341 (Brennan, J., concurring); see also id., 335–36 (free exercise clause protects religious institutions from significant government interference with religious missions); cf. *Hudson Valley Freedom Theater, Inc.* v. *Heimbach*, 671 F.2d 702, 706 n.4 (2d Cir.) (citing cases in which United States Supreme Court has held that corporation is "person" within meaning of fourteenth

---

[12] The first amendment to the United States constitution provides in relevant part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."

amendment), cert. denied, 459 U.S. 857, 103 S. Ct. 127, 74 L. Ed. 2d 110 (1982). This precedent construing the analogous federal constitutional provision is persuasive. See, e.g., *State* v. *Ledbetter*, 275 Conn. 534, 560, 881 A.2d 290 (2005) ("we often rely on the United States Supreme Court's interpretation of the amendments to the constitution of the United States to delineate the boundaries of the protections provided by the constitution of Connecticut" [internal quotation marks omitted]), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

As we have indicated, moreover, the commission refers us to no evidence that the framers of the Connecticut constitution intended to restrict the application of article first, § 3, to natural persons and to exclude corporate persons such as the society from its protection. Accordingly, we conclude that the trial court correctly determined that the society had standing to bring an action under § 52-571b in order to preserve its rights under article first, § 3, of the state constitution.

III

We next consider the society's claim that the trial court incorrectly determined that the commission's denial of the society's application for a special exception did not impose a substantial burden on the society's exercise of religion within the meaning of RLUIPA. We conclude that the substantial burden provision of RLUIPA does not apply to neutral and generally applicable land use regulations that are intended to protect the public health and safety, such as those at issue in the present case. We further conclude that the commission did not apply the regulations in a discriminatory manner.

We begin with the standard of review. The scope and application of RLUIPA's substantial burden provision is a question of statutory interpretation. "With respect

to the construction and application of federal statutes, principles of comity and consistency require us to follow the plain meaning rule for the interpretation of federal statutes because that is the rule of construction utilized by the United States Court of Appeals for the Second Circuit." (Internal quotation marks omitted.) *Dark-Eyes* v. *Commissioner of Revenue Services*, 276 Conn. 559, 571, 887 A.2d 848, cert. denied, 549 U.S. 815, 127 S. Ct. 347, 166 L. Ed. 2d 26 (2006). "If the meaning of the text is not plain, however, we must look to the statute as a whole and construct an interpretation that comports with its primary purpose and does not lead to anomalous or unreasonable results." (Internal quotation marks omitted.) Id.

RLUIPA provides in relevant part that "[n]o government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution . . . (A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc (a) (1) (2000). This provision of RLUIPA applies in any case in which "the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved." 42 U.S.C. § 2000cc (a) (2) (C) (2000).

No party contends that the scope and application of RLUIPA's "substantial burden" provision is plain and unambiguous as applied to the facts of this case, and we agree that the provision reasonably cannot be characterized as plain and unambiguous. A review of the

statute's history and purpose is, therefore, appropriate and instructive to our determination of its meaning. Because the statute has its roots in the decisions of the United States Supreme Court in *Sherbert* v. *Verner*, 374 U.S. 398, 83 S. Ct. 1790, 10 L. Ed. 2d 965 (1963), and in *Employment Division, Dept. of Human Resources* v. *Smith*, 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990), we begin our review with a discussion of those cases. In *Sherbert*, the plaintiff, Adell Sherbert, a member of the Seventh-Day Adventist Church, was discharged by her employer because she refused to work on Saturdays, which was forbidden by her religion. *Sherbert* v. *Verner*, supra, 399. Because she was unable to find another job that would not require her to work on Saturdays, Sherbert applied for state unemployment benefits. Id., 399–400. The employment security commission of the state of South Carolina determined that she was ineligible for benefits under a state law that disqualified workers who refused to accept "suitable work when offered . . . ." (Internal quotation marks omitted.) Id., 401. The law, however, did not disqualify all applicants for benefits who were unavailable for work for a "personal reason . . . ." (Internal quotation marks omitted.) Id., 401 n.4. Sherbert claimed that the employment security commission's determination that she was ineligible for benefits violated her free exercise rights under the first and fourteenth amendments to the United States constitution. Id., 401.

The court noted that it previously had "rejected challenges under the [f]ree [e]xercise clause to governmental regulation of certain overt acts prompted by religious beliefs or principles, for even when the action is in accord with one's religious convictions, [it] is not totally free from legislative restrictions. . . . The conduct or actions so regulated have invariably posed some substantial threat to public safety, peace or order." (Citation omitted; internal quotation marks omitted.) Id., 403.

The court then stated that Sherbert's "conscientious objection to Saturday work constitutes no conduct prompted by religious principles of a kind within the reach of state legislation. If, therefore, the decision [denying eligibility] is to withstand [her] constitutional challenge, it must be either because her disqualification as a beneficiary represents no infringement by the [s]tate of her constitutional rights of free exercise, or because any incidental burden on the free exercise of [her] religion may be justified by a compelling state interest in the regulation of a subject within the [s]tate's constitutional power to regulate . . . ." (Internal quotation marks omitted.) Id. The court concluded that because "[t]he ruling force[d] [Sherbert] to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand," her free exercise rights had been burdened. Id., 404. The court also concluded that the denial of benefits was not justified by a compelling state interest. Id., 406–409. Accordingly, the court concluded that the denial of benefits violated Sherbert's free exercise rights. Id., 410.

In *Employment Division, Dept. of Human Resources* v. *Smith*, supra, 494 U.S. 872, the United States Supreme Court considered whether the free exercise clause permitted the state of Oregon "to include religiously inspired peyote use within the reach of its general criminal prohibition on [the] use of that drug, and thus permits the [s]tate to deny unemployment benefits to persons dismissed from their jobs because of such religiously inspired use." Id., 874. The court noted that it previously had applied a "balancing test" in evaluating such claims, under which "governmental actions that substantially burden a religious practice must be justified by a compelling governmental interest." Id., 883, citing *Sherbert* v. *Verner*, supra, 374 U.S. 402–403. The

court also noted, however, that that test generally had been developed and applied "in a context that lent itself to individualized governmental assessment of the reasons for the relevant [religiously motivated] conduct," and that *Sherbert* merely stood for the proposition that, "[when] the [s]tate has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." Id., 884. The court in *Smith* concluded that the *Sherbert* balancing test was inapplicable to "*generally applicable* prohibitions of *socially harmful* conduct"; (emphasis added) id., 885; because, "[t]o make an individual's obligation to obey such a law contingent [on] the law's coincidence with his religious beliefs, except [when] the [s]tate's interest is compelling—permitting him, by virtue of his beliefs to become a law unto himself . . . contradicts both constitutional tradition and common sense." (Citation omitted; internal quotation marks omitted.) Id. Accordingly, the court concluded that the first amendment did not require that peyote use for religious purposes be exempted from the state's generally applicable criminal prohibition of peyote use. Id., 890.

In response to the court's decision in *Smith*, Congress enacted the Religious Freedom Restoration Act of 1993 (RFRA), Pub. L. No. 103-141, 107 Stat. 1488, codified at 42 U.S.C. § 2000bb et seq. (1994). See *Boerne* v. *Flores*, 521 U.S. 507, 512, 117 S. Ct. 2157, 138 L. Ed. 2d 624 (1997). Under RFRA, the government was prohibited from substantially burdening a person's exercise of religion, even if the burden resulted from a rule of general applicability, unless the government could establish that the burden was in furtherance of a compelling governmental interest and was the least restrictive means of furthering that interest. Id., 515–16; see 42 U.S.C. § 2000bb-1 (a) and (b) (1994). The statute's stated purpose was "to restore the compelling interest test as

set forth in *Sherbert* v. *Verner*, [supra] 374 U.S. 398 . . . ." 42 U.S.C. § 2000bb (b) (1) (1994).

This congressional attempt to force the states to follow *Sherbert* was short-lived, however. In *Boerne*, the United States Supreme Court held that Congress had no power under the enforcement clause of the fourteenth amendment; see U.S. Const., amend. XIV, § 5; to enact "a substantive change in constitutional protections." *Boerne* v. *Flores*, supra, 521 U.S. 532. In support of its conclusion that RFRA represented an unconstitutional attempt to expand the scope of the right protected by the free exercise clause, the court stated that, "[i]n most cases, the state laws to which RFRA applies are not ones which will have been motivated by religious bigotry. . . . RFRA's substantial-burden test . . . is not even a discriminatory-effects or disparate-impact test. It is a reality of the modern regulatory state that numerous state laws, such as the zoning regulations at issue [in *Boerne*], impose a substantial burden on a large class of individuals. When the exercise of religion has been burdened in an incidental way by a law of general application, it does not follow that the persons affected have been burdened any more than other citizens, let alone burdened because of their religious beliefs." (Citation omitted.) Id., 535. The court concluded, therefore, that RFRA was unconstitutional as applied to the states. See id., 532, 536.

Congress responded to this development by enacting RLUIPA. See *Sts. Constantine & Helen Greek Orthodox Church, Inc.* v. *New Berlin*, 396 F.3d 895, 897 (7th Cir. 2005). In enacting RLUIPA, Congress sought "to avoid RFRA's fate by limiting the scope of [RLUIPA] to (1) state regulations . . . that affect commerce, (2) programs that receive federal financial assistance, and (3) programs under which the agency makes 'individualized assessments of the proposed uses for the property involved.' " Id. By imposing the last limitation, Congress

intended to codify the United States Supreme Court's decision in *Sherbert* v. *Verner*, supra, 374 U.S. 398. *Sts. Constantine & Helen Greek Orthodox Church, Inc.* v. *New Berlin*, supra, 897. Congress believed that *Boerne* had reaffirmed *Sherbert* "insofar as [*Sherbert* held] that a state that has a system for granting individual exemptions from a general rule must have a compelling reason to deny a religious group an exemption that is sought on the basis of hardship or, in the language of [RLUIPA], of 'a substantial burden on . . . religious exercise.' . . . *Sherbert* was an interpretation of the [c]onstitution, and so the creation of a federal judicial remedy for conduct contrary to its doctrine [was believed by Congress to be] an uncontroversial use of section 5 [of the fourteenth amendment]."[13] (Citation omitted.) Id.

Not surprisingly, the meaning of the phrase "substantial burden" set forth in RLUIPA has been the subject of much litigation. Many courts that have considered the issue have concluded that, to avoid the potential constitutional infirmity that was fatal to RFRA, the phrase "substantial burden" cannot be interpreted in a manner that would grant a broader right to religious exercise than the courts have recognized under the free

---

[13] In *Boerne*, the court also concluded that RFRA was unconstitutionally broad; see *Boerne* v. *Flores*, supra, 521 U.S. 532–33; because there was no evidence of a recent history "of legislation enacted or enforced due to animus or hostility to the burdened religious practices or . . . some widespread pattern of religious discrimination in this country. Congress' concern was with the incidental burdens imposed, not the object or purpose of the legislation." Id., 531. In a joint statement explaining the background of the legislation that ultimately became RLUIPA, the cosponsors of the proposed legislation, Senators Orrin Hatch and Edward Kennedy, stated that evidence presented at congressional hearings on the proposed legislation had demonstrated that "[c]hurches in general, and new, small, or unfamiliar churches in particular, are frequently discriminated against on the face of zoning codes and also in the highly individualized and discretionary processes of land use regulation." 146 Cong. Rec. 16,698 (2000). Senators Hatch and Kennedy also stated that evidence presented at the congressional hearings established that such discrimination "is often covert." Id., 16,699.

exercise clause.[14] See, e.g., *Murphy* v. *Zoning Commission*, 402 F.3d 342, 350 (2d Cir. 2005) ("[i]n enacting RLUIPA, Congress endeavored to codify existing [f]ree [e]xercise jurisprudence");[15] *Midrash Sephardi, Inc.* v. *Surfside*, 366 F.3d 1214, 1237 (11th Cir. 2004) (because RLUIPA codifies existing first amendment and equal protection rights against state action, it is appropriate and constitutional use of Congress' authority under § 5 of fourteenth amendment), cert. denied, 543 U.S. 1146, 125 S. Ct. 1295, 161 L. Ed. 2d 106 (2005); *Episcopal Student Foundation* v. *Ann Arbor*, 341 F. Sup. 2d 691, 701 (E.D. Mich. 2004) ("RLUIPA's history demonstrates that Congress intended to leave intact the traditional 'substantial burden' test, as defined by the Supreme Court's free exercise jurisprudence"); *Vineyard Christian Fellowship of Evanston, Inc.* v. *Evanston*, 250 F. Sup. 2d 961, 991 (N.D. Ill. 2003) ("[t]he history of [RLUIPA] demonstrates that Congress did not intend to change traditional Supreme Court jurisprudence on the definition of substantial burden"); *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints* v. *West Linn*, 338 Or. 453, 464, 111 P.3d 1123 (2005) ("Congress used the term 'substantial burden' because that was the term that the [United States Supreme] Court had used in *Sherbert* and other [f]ree [e]xercise cases decided before *Smith*"). See generally *Legal Services Corp.* v. *Velazquez*, 531 U.S. 533, 545,

---

[14] This view finds some support in RLUIPA's legislative history. The joint statement issued by Senators Orrin Hatch and Edward Kennedy on the purpose of RLUIPA provided that "it [was] not the intent of [RLUIPA] to create a new standard for the definition of 'substantial burden' on religious exercise. Instead that term as used in [RLUIPA] should be interpreted by reference to Supreme Court jurisprudence. . . . The term 'substantial burden' . . . [was] not intended to be given any broader interpretation than the Supreme Court's articulation of the concept of substantial burden or religious exercise." 146 Cong. Rec. 16,700 (2000).

[15] The court in *Murphy* also stated that it was not required "to determine whether Congress in fact succeeded in this endeavor." *Murphy* v. *Zoning Commission*, supra, 402 F.3d 350 n.6.

121 S. Ct. 1043, 149 L. Ed. 2d 63 (2001) ("[i]t is well understood that when there are two reasonable constructions for a statute, yet one raises a constitutional question, the [c]ourt should prefer the interpretation which avoids the constitutional issue").

Consistent with this view, a number of courts have adopted a "substantial burden" standard that reflects the first amendment principle that the government may not entirely exclude religious uses from a jurisdiction. In *Civil Liberties for Urban Believers* v. *Chicago*, 342 F.3d 752 (7th Cir. 2003), cert. denied, 541 U.S. 1096, 124 S. Ct. 2816, 159 L. Ed. 2d 262 (2004), for example, the Court of Appeals for the Seventh Circuit concluded that, under existing first amendment jurisprudence, the zoning ordinances under review did not impose a substantial burden on local religious institutions because "they [did] not render impracticable the use of real property in [the jurisdiction] for religious exercise, much less discourage churches from locating or attempting to locate [there]."[16] Id., 761; see also *Episcopal Student Foundation* v. *Ann Arbor*, supra, 341 F. Sup. 2d 704 (religious exercise was not substantially burdened by denial of permit to demolish existing struc-

---

[16] The court in *Civil Liberties for Urban Believers* cited *Braunfeld* v. *Brown*, 366 U.S. 599, 605, 81 S. Ct. 1144, 6 L. Ed. 2d 563 (1961), for the proposition that no substantial burden has been placed on the free exercise of religion when a law merely "operates so as to make the practice of . . . religious beliefs more expensive." (Internal quotation marks omitted.) *Civil Liberties for Urban Believers* v. *Chicago*, supra, 342 F.3d 762.

In the present case, the amicus argues that "the 'effectively impracticable' standard of [*Civil Liberties for Urban Believers*] cannot be divorced from the context of the facial challenge in which it was announced." It further argues that, although "[i]t is a firmly entrenched distinction in religious land use cases that the general requirement to apply for a permit does *not* impose a substantial burden . . . the particular denial of such a permit may." (Emphasis in original.) As we discuss more fully subsequently in this opinion, however, if the requirement that a religious institution apply for a permit does not violate the constitution, then the denial of the permit for reasons that are neutrally and generally applicable to all persons in the jurisdiction also does not violate the constitution.

ture and to build new religious facility when "there [was] no indication that [the religious institution was] precluded from fulfilling its religious mission through worship as a whole . . . in other locations throughout the city"), citing *Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc.* v. *Lakewood,* 699 F.2d 303, 307 (6th Cir.), cert. denied, 464 U.S. 815, 104 S. Ct. 72, 78 L. Ed. 2d 85 (1983); *Greater Bible Way Temple* v. *Jackson,* 478 Mich. 373, 401–402, 733 N.W.2d 734 (2007) (city's refusal to rezone property to allow construction of religious facility was not substantial burden on religious institute when other land in jurisdiction was zoned for that use).[17]

RLUIPA, however, contains a prohibition against excluding or unreasonably limiting religious uses in a jurisdiction that is separate and distinct from its "substantial burden" provision. See 42 U.S.C. § 2000cc (b) (3) (2000). As at least one court has recognized, although an unreasonable limitation on religious uses within a jurisdiction undoubtedly would impose a substantial burden on religious institutions, to interpret the "substantial burden" provision as being coextensive with the "exclusion and limits" provision would be to render one of the provisions superfluous. See *Midrash*

---

[17] Other courts have relied on *Sherbert* in concluding that a substantial burden exists within the meaning of RLUIPA when a government regulation " 'pressures' or 'forces' a choice between following religious precepts and forfeiting certain benefits, on the one hand, and abandoning one or more of those precepts in order to obtain the benefits, on the other." *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints,* supra, 338 Or. 466, citing *Sherbert* v. *Verner,* supra, 374 U.S. 404; see also *Thomas* v. *Review Board of the Indiana Employment Security Division,* 450 U.S. 707, 717–18, 101 S. Ct. 1425, 67 L. Ed. 2d 624 (1981) (when state puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden [on] religion exists"); cf. *Guru Nanak Sikh Society* v. *Sutter,* 456 F.3d 978, 988 (9th Cir. 2006) (under *Sherbert* and other pre-*Smith* first amendment jurisprudence, land use regulations impose substantial burden when they are "oppressive to a significantly great extent" [internal quotation marks omitted]).

*Sephardi, Inc.* v. *Surfside,* supra, 366 F.3d 1227 (rejecting definition of "substantial burden" adopted by court in *Civil Liberties for Urban Believers* because it would render "exclusion and limits" provision of 42 U.S.C. § 2000cc [b] [3] meaningless); cf. *Sts. Constantine & Helen Greek Orthodox Church, Inc.* v. *New Berlin,* supra, 396 F.3d 899–901 (under particular circumstances of case, church was not required to show that it was excluded from entire jurisdiction).[18]

In addition, the express language of RLUIPA protects a broader free exercise right than that recognized by the United States Supreme Court. Unlike RFRA, which defines "exercise of religion" as "the exercise of religion under the [f]irst [a]mendment to the [United States] [c]onstitution"; 42 U.S.C. § 2000bb-2 (4) (1994); RLUIPA defines "religious exercise" to include "[t]he use, build-

---

[18] In *Sts. Constantine & Helen Greek Orthodox Church, Inc.* v. *New Berlin,* supra, 396 F.3d 898, the plaintiff church submitted an application to rezone its property from residential to institutional so that it could build a church facility. To allay the city's concerns that the property could be used for other purposes if the church failed to raise sufficient construction funds, the church coupled the rezoning proposal with a zoning device that would limit the use of the property to church related uses. Id. The city's planning commission denied the application. See id. The Seventh Circuit Court of Appeals concluded that "having either to sell the [property] . . . and find a suitable alternative parcel or be subjected to unreasonable delay by having to restart the permit process to satisfy the [p]lanning [c]ommission about a contingency for which the [c]hurch has already provided complete satisfaction"; id., 900; constituted a substantial burden under RLUIPA. Id., 901. In reaching this conclusion, the court suggested that the city had been "playing a delaying game"; id., 899; and that its concerns were "legal chimeras." Id., 900. Under these circumstances, the church was not required to prove that it had been entirely excluded from the jurisdiction to establish a substantial burden. See id., 899–901. In our view, this case stands for the proposition that, when the government has acted arbitrarily and capriciously in prohibiting a religious land use, no further demonstration of a substantial burden is required. Cf. *Guru Nanak Sikh Society* v. *Sutter,* 456 F.3d 978, 990–92 (9th Cir. 2006) (when government inconsistently applied development concerns, rejected adequate mitigating conditions and significantly reduced area of jurisdiction in which religious facility could be built, plaintiff established substantial burden).

ing, or conversion of real property for the purpose of religious exercise" with respect to "the person or entity that uses or intends to use the property for that purpose."[19] 42 U.S.C. § 2000cc-5 (7) (B) (2000). "Religious exercise" also includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5 (7) (A) (2000). These statutory provisions are in contrast to existing first amendment jurisprudence, which holds that "building and owning a church is a desirable accessory of worship, not a fundamental tenet of the [c]ongregation's religious beliefs" and, therefore, do not constitute the exercise of religion within the meaning of the free exercise clause. *Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc.* v. *Lakewood*, supra, 699 F.2d 307;[20] cf.

---

[19] Title 42 of the United States Code, § 2000cc-5, provides in relevant part: "(3) Free Exercise Clause

"The term 'Free Exercise Clause' means that portion of the first amendment to the Constitution that proscribes laws prohibiting the free exercise of religion.

\* \* \*

"(7) Religious exercise

"(A) In general

"The term 'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief.

"(B) Rule

"The use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose." 42 U.S.C. § 2000cc-5 (2000).

[20] The United States Supreme Court has not considered the extent to which the construction and use of places of worship constitute the exercise of religion under the free exercise clause of the first amendment. Our research, however, has revealed no pre-*Smith* cases supporting the proposition that the construction and use of a place of worship constitutes the exercise of religion per se. Indeed, the weight of authority is to the contrary. See *Christian Gospel Church, Inc.* v. *San Francisco*, 896 F.2d 1221, 1224 (9th Cir.) (denial of special permit to hold worship services in residence was constitutional in light of government's interest in maintaining integrity of zoning scheme and protecting residential neighborhoods), cert. denied, 498 U.S. 999, 111 S. Ct. 559, 112 L. Ed. 2d 565 (1990); *Messiah Baptist Church* v. *Jefferson*, 859 F.2d 820, 825 (10th Cir. 1988) (denial of special permit to build church in residential zone did "not regulate any religious

*Employment Division, Dept. of Human Resources* v.
*Smith,* supra, 494 U.S. 885–89 (because courts are
barred from determining centrality of religious belief or
practice, government can enforce "generally applicable
prohibitions of socially harmful conduct" regardless of
whether conduct is central to exercise of religion).
Thus, "whatever the substantial burden test required
prior to the passage of RLUIPA, the statute substantially
modified and relaxed the definition of 'religious exer-
cise.'" *Grace United Methodist Church* v. *Cheyenne,*
451 F.3d 643, 663 (10th Cir. 2006); see also *Civil Liber-
ties for Urban Believers* v. *Chicago,* supra, 342 F.3d 760

---

conduct of the church or its members"), cert. denied, 490 U.S. 1005, 109 S.
Ct. 1638, 104 L. Ed. 2d 154 (1989); *Lakewood, Ohio Congregation of Jehovah's
Witnesses, Inc.* v. *Lakewood,* supra, 699 F.2d 307 ("building and owning a
church is a desirable accessory of worship, not a fundamental tenet of the
[c]ongregation's religious beliefs," and constitutionally may be subject to
zoning regulations); *United States* v. *Airmont,* 839 F. Sup. 1054, 1065
(S.D.N.Y. 1993) (government constitutionally "may require that a proposed
church show that its use is compatible with the neighborhood, will not be
detrimental to the health, safety and general welfare of the residents, and
that the use will otherwise comply with the zoning code"), rev'd on other
grounds sub nom. *LeBlanc-Sternberg* v. *Fletcher,* 67 F.3d 412 (2d Cir. 1995);
*Love Church* v. *Evanston,* 671 F. Sup. 508, 513–14 (N.D. Ill. 1987) (because
religious group's "freedom to worship is at best tangentially related to
worshiping in [its] own building," zoning regulation requiring special permit
to operate church was not unconstitutional); *Corp. of the Presiding Bishop
of the Church of Jesus Christ of Latter-Day Saints* v. *Porterville,* 90 Cal.
App. 2d 656, 660, 203 P.2d 823 (denial of permit to build church in residential
zone "did not prohibit anyone from religious worship" when church could
be built in another area zoned for that purpose), appeal dismissed, 338 U.S.
805, 70 S. Ct. 78, 94 L. Ed. 2d 487 (1949); *Colorado Springs* v. *Blanche,*
761 P.2d 212, 217 (Colo. 1988) (regulation allowing operation of religious
institution in residential zone as conditional use did not violate first amend-
ment); *State* v. *Cameron,* 184 N.J. Super. 66, 81, 445 A.2d 75 (Law Div. 1982)
(because ordinance banning churches in residential zone only precluded
"congregation from performing acts that [were] in keeping with its secular
interests," ordinance did not burden free exercise of religion), aff'd, 189
N.J. Super. 404, 460 A.2d 191 (App. Div. 1983), rev'd on other grounds, 100
N.J. 586, 498 A.2d 1217 (1985); cf. *Islamic Center of Mississippi, Inc.* v.
*Starkville,* 840 F.2d 293, 302–303 (5th Cir. 1988) (when evidence established
that government had treated Islamic group differently than Christian groups,
denial of special exception to build mosque violated first amendment).

(Congress intended "to expand the concept of religious exercise contemplated both in decisions discussing the precursory RFRA . . . and in traditional [f]irst [a]mendment jurisprudence" [citation omitted]). In addition, it is clear that, in adopting this broad statutory definition of "religious exercise" set forth in RLUIPA and eliminating any centrality test, Congress necessarily contemplated that a broader range of governmental conduct could be prohibited as imposing a "substantial burden" on religious exercise than the range of conduct that could be prohibited under the Supreme Court's existing free exercise clause jurisprudence. Cf. *Employment Division, Dept. of Human Resources* v. *Smith*, supra, 887–88 n.4 (" '[c]onstitutionally significant burden' would seem to be 'centrality' under another name"); id. ("inquiry into 'severe impact' is no different from inquiry into centrality"); *Civil Liberties for Urban Believers* v. *Chicago*, supra, 761 (expanded definition of "religious exercise" could expand meaning of "substantial burden"); *Elsinore Christian Center* v. *Lake Elsinore*, 291 F. Sup. 2d 1083, 1091 (C.D. Cal. 2003) ("[b]ecause use of land *is* 'religious exercise' under RLUIPA, there can be no doubt that the [c]ity's action denying use of the [s]ubject [p]roperty is a 'substantial burden' on [religious exercise]" [emphasis in original]).

On the other hand, if RLUIPA's broader definition of religious exercise is simply substituted for the scope of the right as contemplated in the first amendment cases, "the meaning of 'substantial burden on religious exercise' could be read to include the effect of any regulation that inhibits or constrains the use, building, or conversion of real property for the purpose of religious exercise." *Civil Liberties for Urban Believers* v. *Chicago*, supra, 342 F.3d 761. Under such an interpretation, "the slightest obstacle to [the construction and use of religious facilities] incidental to the regulation of land use—however minor the burden it were to

impose—could then constitute a burden sufficient to trigger RLUIPA's requirement that the regulation advance a compelling governmental interest by the least restrictive means." Id.; see also *Petra Presbyterian Church* v. *Northbrook*, 489 F.3d 846, 851 (7th Cir. 2007) ("[u]nless the requirement of substantial burden is taken seriously, the difficulty of proving a compelling governmental interest will free religious organizations from zoning restrictions of any kind"), cert. denied, 552 U.S. 1131, 128 S. Ct. 914, 169 L. Ed. 2d 786 (2008).[21] To give such a broad meaning to the phrase "substantial burden" would be constitutionally suspect under *Boerne* because it would be in direct conflict with the holding of *Smith* that generally applicable laws that are intended to protect the public health and safety constitutionally may be applied to religious conduct without being justified by a compelling government interest, regardless of the burden that the laws impose on such conduct. See *Employment Division, Dept. of Human Resources* v. *Smith*, supra, 494 U.S. 885; see also *Boerne* v. *Flores*, supra, 521 U.S. 535 ("[w]hen the exercise of religion has been burdened in an incidental way by a law of general application, it does not follow that the persons affected have been burdened any more than other citizens, let alone burdened because of their religious beliefs"); *Greater Bible Way Temple* v. *Jackson*, supra, 478 Mich. 408 n.27 (conclusion that, under RLUIPA, religious institution need not abide by generally applicable, religion-neutral zoning ordinance unless justified by compelling governmental interest would be inconsistent with *Smith*). Thus, interpreting the sub-

[21] Cf. *Westchester Day School* v. *Mamaroneck*, 386 F.3d 183 (2d Cir. 2004). In *Westchester Day School*, the court declined to reach the question of what constituted a substantial burden under RLUIPA. Id., 190. The court stated in dictum, however, that it doubted that the statute was intended to allow a land use agency to treat a religious institution more favorably than an identically situated secular entity because such an interpretation would raise establishment clause issues. Id., 189.

stantial burden provision of RLUIPA as creating a significantly broader right than that guaranteed by the free exercise clause would render the statute constitutionally suspect under *Boerne*. On the other hand, interpreting the provision as creating a right with precisely the same scope and contours as that guaranteed by the free exercise clause would ignore the statute's express terms and effectively render it superfluous.

We conclude that the key to this interpretive quandary is not to be found, as the parties and the trial court in the present case assumed, in the first amendment jurisprudence defining what governmental conduct constitutes a "substantial burden" on the free exercise of religion, but in the case law addressing the question of when the substantial burden provision applies to governmental conduct in the first instance. As we have indicated, under 42 U.S.C. § 2000cc (a) (2) (C), the substantial burden provision of RLUIPA applies only to cases in which the "government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved." As we also have indicated, the "individualized assessment" language of RLUIPA traces its roots to the holding of *Smith* that the *Sherbert* balancing test applied only "in a context that lent itself to individualized governmental assessment of the *reasons* for the relevant conduct." (Emphasis added.) *Employment Division, Dept. of Human Resources* v. *Smith*, supra, 494 U.S. 884. Under *Sherbert*, when the government has the discretion to exempt certain conduct from the applicable law for secular reasons, the government cannot refuse to extend the exemption to similar conduct that is religiously motivated. See id.

"[S]everal federal courts have held that land use regulations, i.e., zoning ordinances, are neutral and generally applicable notwithstanding that they may have individu-

alized procedures for obtaining special use permits or variances." (Internal quotation marks omitted.) *Grace United Methodist Church* v. *Cheyenne*, supra, 451 F.3d 651. "Indeed, in the land use context, the Sixth, Seventh, Eighth, and Eleventh Circuits have rejected a per se approach and instead apply a fact-specific inquiry to determine whether the regulation at issue was motivated by discriminatory animus, or whether the facts support an argument that the challenged rule is applied in a discriminatory fashion that disadvantages religious groups or organizations. See, e.g., *Civil Liberties for Urban Believers* v. [*Chicago*, supra, 342 F.3d 764–65] (ordinance permitting churches in all residential areas but requiring special use approval to operate churches in commercial and business areas and limiting church operation in manufacturing areas held neutral [law] of general applicability); *First Assembly of God of Naples* [*Florida, Inc.*] v. *Collier County*, 20 F.3d 419, 423–24 (11th Cir. 1994) (city's ordinance prohibiting homeless shelters in certain areas held neutral and of general applicability because motivated by health and safety concerns, applied to both church and secular group homes and did not completely prohibit operation of homeless shelters) [cert denied, 513 U.S. 1080, 115 S. Ct. 730, 130 L. Ed. 2d 634 (1995)]; *Cornerstone Bible Church* v. [*Hastings*], 948 F.2d 464, 472 (8th Cir. 1991) (zoning ordinance excluding churches and other nonprofits from city's central business district had no impact on religious belief and was general law applying to all land use in city)." *Grace United Methodist Church* v. *Cheyenne*, supra, 651; see also *Westchester Day School* v. *Mamaroneck*, 504 F.3d 338, 350 (2d Cir. 2007) (religious organizations are precluded "from demonstrating substantial burden in the neutral application of legitimate land use restrictions"); *San Jose Christian College* v. *Morgan Hill*, 360 F.3d 1024, 1031 (9th Cir. 2004) ("[zoning] law is one of neutrality and general

applicability if it does not aim to infringe [on] or restrict practices because of their religious motivation" [internal quotation marks omitted]); *Mount Elliott Cemetery Assn.* v. *Troy*, 171 F.3d 398, 405 (6th Cir. 1999) ("[t]he requirement that the law be of general applicability protects against unequal treatment which results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation" [internal quotation marks omitted]); *Rector, Wardens & Members of the Vestry of St. Bartholomew's Church* v. *New York*, 914 F.2d 348, 354–55 (2d Cir. 1990) (without proof that landmark preservation commission applied landmark law to church in discriminatory manner, law was neutral and generally applicable), cert. denied sub nom. *Committee to Oppose the Sale of St. Bartholomew's Church, Inc.* v. *Rector, Wardens & Members of the Vestry of St. Bartholomew's Church*, 499 U.S. 905, 111 S. Ct. 1103, 113 L. Ed. 2d 214 (1991). "According to these courts, although zoning laws may permit some individualized assessment for variances, they are generally applicable if they are motivated by secular purposes and impact equally all land owners in the city . . . ." *Grace United Methodist Church* v. *Cheyenne*, supra, 651.[22]

We agree with these courts that a zoning regulation that is applicable without discrimination to all property

[22] The court in *Grace United Methodist Church* v. *Cheyenne*, supra, 451 F.3d 643, concluded that the zoning ordinance under review "constitute[d] a neutral policy of general applicability which [did] not offend free exercise principles." Id., 655. The court then proceeded to consider the plaintiff church's claim that the trial court improperly had instructed the jury under the substantial burden provision of RLUIPA. Id., 659–60. The court concluded that the trial court improperly had instructed the jury but that the impropriety was harmless because the jury concluded that the church was engaged in a sincere exercise of religion. Id., 663–64. It is not apparent to us why the court's conclusion that the zoning regulation was a neutral and generally applicable law was not dispositive of the church's RLUIPA claim.

owners in a jurisdiction and is intended to protect the public health and safety does not constitute an "individualized assessment" under existing first amendment jurisprudence. In *Sherbert*, which employed the "individualized assessment" rule that RLUIPA was intended to codify; see *Employment Division, Dept. of Human Resources* v. *Smith*, supra, 494 U.S. 884; the government had the discretion to grant an exemption from the unemployment law's availability requirement if the applicant was unavailable for certain personal reasons but to withhold the exemption if the personal reason was related to religion. *Sherbert* v. *Verner*, supra, 374 U.S. 401–402 n.4. Thus, the government was authorized to treat applicants differently on the basis of the *motivation* for their conduct, and to treat religiously motivated conduct less favorably.[23] Moreover, the eligibility rules for unemployment benefits under review in that case were not intended to protect the public health and safety. Id., 403 (distinguishing unemployment law from laws governing "substantial threat to public safety, peace of order"). If a zoning board has no discretion to scrutinize the *reasons* for land use applications and to exempt certain secular uses from the zoning regulations while withholding exemptions for similarly intense religious uses, then *Sherbert* is inapplicable. We further note that a joint statement issued by the sponsors of the bill that ultimately became RLUIPA specifically provides that "[t]his [a]ct does not provide religious institu-

---

[23] We recognize that the law at issue in *Sherbert* contained no language expressly allowing the state to apply different standards to religiously motivated conduct than to other personally motivated conduct. Nevertheless, the court concluded that the state of South Carolina must have had discretion to do so because, otherwise, "it would have been unnecessary for the [South Carolina Supreme Court] to have decided [Sherbert's] constitutional challenge to the application of the statute under the [f]ree [e]xercise [c]lause." *Sherbert* v. *Verner*, supra, 374 U.S. 401–402 n.4. In other words, the court recognized that, if the law had applied neutrally to *all* personal reasons, including religious reasons, then Sherbert would have had no viable first amendment claim.

tions with immunity from land use regulation, nor does it relieve religious institutions from applying for variances, special permits or exceptions, hardship approval, or other relief provision in land use regulations, *where available without discrimination or unfair delay*." (Emphasis added.) 146 Cong. Rec. 16,700 (2000), joint statement of Senators Orrin Hatch and Edward Kennedy. Because RLUIPA's substantial burden provision applies only when the government has made an "individualized [assessment] of the proposed [use]"; 42 U.S.C. § 2000cc (a) (2) (C) (2000); we conclude that the provision applies only when the government has the discretion to apply a land use regulation in a manner that discriminates against religious institutions in general or against a particular religion or denomination.[24]

In the present case, the provisions of the town's regulations allowing religious facilities to be built in a resi-

---

[24] The society contends that the decision of the United States District Court in *Fifth Avenue Presbyterian Church* v. *New York*, Docket No. 01 CIV 11493, 2004 U.S. Dist. LEXIS 22185 (S.D.N.Y. October 29, 2004), aff'd, Docket No. 04-6299-CV, 2006 U.S. App. LEXIS 10731 (2d Cir. April 26, 2006), cert. denied, 549 U.S. 954, 127 S. Ct. 387, 166 L. Ed. 2d 271 (2006), supports its claim. The District Court in that case stated "that demonstrating substantial burden [on the free exercise of religion] is not a particularly onerous task"; (internal quotation marks omitted) *Fifth Avenue Presbyterian Church* v. *New York*, supra, 2004 U.S. Dist. LEXIS 22185, *9, quoting *McEachin* v. *McGuinnis*, 357 F.3d 197, 202 (2d Cir. 2004); and concluded that the removal by city police of homeless persons sleeping on the plaintiff church's property constituted a substantial burden on the church's religious belief. *Fifth Avenue Presbyterian Church* v. *New York*, supra, 2004 U.S. Dist. LEXIS 22185, *8. That case, however, did not involve RLUIPA. Moreover, the District Court concluded that the city's practice was not generally applicable or neutrally enforced; see id., *20–*22; and did not protect the public health and safety. Id., *33. Under such circumstances, *Sherbert*'s "substantial burden" test may apply. Indeed, it is arguable that, under circumstances like those of *Fifth Avenue Presbyterian Church*, the religious institution would not be required to establish a substantial burden in the first instance. See *Tenafly Eruv Assn., Inc.* v. *Tenafly*, 309 F.3d 144, 170 (3d Cir. 2002) ("under *Smith* . . . there is no substantial burden requirement when government discriminates against religious conduct"), cert. denied, 539 U.S. 942, 123 S. Ct. 2609, 156 L. Ed. 2d 628 (2003).

dential zone by special exception treat such uses more, not less, favorably than certain other nonresidential uses that are not allowed by special exception. Moreover, although the commission has some discretion to determine whether a proposed specially permitted use is consistent with residential use, the regulations do not grant the commission the discretion to apply the standards differently to religious facilities than it applies them to the other uses allowed by special exception, such as clubs, private schools, seasonal camps, certain public utility buildings, hospitals, sanitary landfills, nurseries and horse boarding stables. See Newtown Zoning Regs., § 4.06 et seq. Rather, in reviewing each application for a special exception, the commission considers "the impact of such uses and structures upon the neighborhood and surrounding area and upon the public health, safety convenience and welfare"; id., § 8.04; and certain other criteria unrelated to the specific nature of the proposed use. See id., § 8.04.700 et seq. We therefore conclude that, because the town's zoning regulations do not allow for an "individualized assessment," as that term is used in first amendment jurisprudence, the substantial burden provision of 42 U.S.C. § 2000cc (a) (1) does not apply to the society's claim.

We further conclude that record does not support a finding that the commission abused the discretion granted to it under the regulations by applying the regulations in a discriminatory manner, thereby violating 42 U.S.C. § 2000cc (b) (2).[25] See footnote 2 of this opinion. The society claims that the commission's denial of its application on the basis of the temple's Asian design and the fact that Buddhist festivals would be celebrated on the property demonstrate its discriminatory intent.

[25] The society did not specifically invoke this portion of RLUIPA in its complaint or on appeal. The society has claimed, however, that the commission acted in a discriminatory manner.

Upon a careful review of the record, however, we are satisfied that the commission's concerns were motivated not by religious bigotry but by neutral considerations that it would apply equally to any proposed use of the property. It does not follow from the commission's conclusions that the design was not in harmony with the other buildings in the area and that the festivals would be unduly disruptive that the commission or the neighboring residents were biased against religious uses in general or Buddhism in particular, and nothing else in the record supports such a finding. Indeed, a number of residents who strongly opposed the granting of the special exception expressed their strong admiration for the members of the society, their hope that the monks would continue to live on the property and their hope that the society would be able to find a more suitable location within the town to build a temple for large gatherings. The commission expressed similar sentiments in its decision denying the application, stating that "[d]iversity of religion should be encouraged in Newtown," and expressing its hope that the society "could find property more suitable to [its] needs." Cf. *Church of the Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U.S. 520, 541, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993) (concluding that ordinance was motivated by animosity toward Santeria religion when record demonstrated that various city officials had made critical statements to public about Santeria religion and had indicated that devotees of that religion were "in violation of everything this country stands for," that Bible did not allow Santeria practices, that Santeria religion was "a sin, foolishness, an abomination to the Lord, and the worship of demons," and that community would not tolerate religious practices that were abhorrent to citizens [internal quotation marks omitted]). Nothing in the record establishes that those comments, or the reasons that the commission gave for denying the society's application,

were pretextual or otherwise designed to conceal an unlawful discriminatory intent. Accordingly, we reject the society's claim that the commission did not apply the zoning regulations in a neutral manner.

In sum, we conclude that the "substantial burden" provision of RLUIPA does not apply under the facts of this case. Therefore, we reject the society's claim that the commission's denial of its application for a special exception violated that provision of RLUIPA.

IV

The society further claims that the commission's denial of its application for a special exception unlawfully burdened the society's exercise of religion under § 52-571b. The society contends that § 52-571b provides broader protection to religious exercise than RLUIPA because the state statute prohibits governmental conduct that burdens the exercise of religion under the state constitution, whereas RLUIPA bars conduct that imposes a *substantial* burden on the right to the free exercise of religion under the first amendment. See *Murphy* v. *Zoning Commission*, 289 F. Sup. 2d 87, 114 (D. Conn. 2003) (§ 52-571b "covers more conduct than RLUIPA"), vacated on other grounds, 402 F.3d 342 (2d Cir. 2005). We conclude that, as applied in the land use context, § 52-571b is no broader than RLUIPA, and, therefore, § 52-571b does not apply to the society's claim.

The scope and meaning of the word "burden" as used in § 52-571b is a question of statutory interpretation over which our review is plenary. See, e.g., *Barry* v. *Quality Steel Products, Inc.*, 280 Conn. 1, 8, 905 A.2d 55 (2006). "The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case, includ-

ing the question of whether the language does so apply."
(Internal quotation marks omitted.) Id.

We begin with the relevant statutory language. General Statutes § 52-571b provides in relevant part: "(a) The state or any political subdivision of the state shall not burden a person's exercise of religion under section 3 of article first of the Constitution of the state even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

"(b) The state or any political subdivision of the state may burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest, and (2) is the least restrictive means of furthering that compelling governmental interest. . . ."

Our resolution of the society's claim requires us to determine the meaning of the terms "burden" and "exercise of religion," as they are used in § 52-571b. Because neither of those terms has a meaning that is plain and unambiguous as applied to the facts of this case, we look to the statute's purpose and history to ascertain their meaning.[26] Like RFRA, § 52-571b was enacted in response to the United States Supreme Court's decision in *Employment Division, Dept. of Human Resources* v. *Smith,* supra, 494 U.S. 885, in which the court held that a generally applicable prohibition against socially harmful conduct does not violate the free exercise clause, regardless of whether the law burdens religious exercise. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 4, 1993 Sess., p. 1142, testimony of attorney John King; 36 S. Proc., Pt. 8, 1993 Sess., p.

---

[26] We are mindful that, under General Statutes § 1-2z, we cannot look beyond the text of the statutory language if that language, as applied to the facts of the case, is plain and unambiguous and does not yield a bizarre or unworkable result. There is no dispute that the statutory language at issue in this case is not plain and unambiguous as applied to the facts of this case.

2780, remarks of Senator George C. Jepsen; 36 H.R. Proc., Pt. 14, 1993 Sess., pp. 4922–24, 4927, remarks of Representatives Richard D. Tulisano, Robert M. Ward and Michael J. Jarjura. Also like RFRA, the purpose of § 52-571b was to restore the balancing standard, articulated by the United States Supreme Court in *Sherbert* v. *Verner*, supra, 374 U.S. 403, under which a law that burdens religious exercise must be justified by a compelling governmental interest.[27] See 36 S. Proc., supra, p. 2780, remarks of Senator Jepsen; 36 H.R. Proc., supra, p. 4943, remarks of Representative Dale W. Radcliffe; see also 36 S. Proc., supra, p. 2785, remarks of Senator Jepsen ("this bill does not expand, contract or alter the ability of a claimant to obtain relief in a manner consistent with the [United States] Supreme Court's free exercise . . . jurisprudence under the compelling interest test prior to . . . *Smith*").

As we have explained; see part III of this opinion; prior to *Smith*, no court had held, under the *Sherbert* balancing test, that erecting a place of worship on a particular property constitutes the exercise of religion for purposes of the first amendment. Indeed, the great weight of authority is to the contrary.[28] See footnote 20

[27] We note that the United States Supreme Court in *Sherbert* v. *Verner*, supra, 374 U.S. 398, which RFRA and § 52-571b intended to codify, did not use the "substantial burden" language but indicated that any "incidental burden" on the free exercise of religion must be justified by a compelling state interest. Id., 403. The court in *Smith* later characterized *Sherbert* as holding that "governmental actions that *substantially* burden a religious practice must be justified by a compelling governmental interest." (Emphasis added.) *Employment Division, Dept. of Human Resources* v. *Smith*, supra, 494 U.S. 883.

[28] Although the society makes no direct claim under the first amendment or under article first, § 3, of the Connecticut constitution, it nevertheless asserts that, even if the construction of a place of worship generally does not constitute the exercise of religion, "building this temple now on [this specific property] is absolutely central to [*the society's*] exercise of religion . . . ." (Emphasis added.) This claim apparently is premised on the testimony that the property's peaceful, rural characteristics are essential to Buddhist meditation practices. Under *Smith*, however, any attempt to evaluate the centrality of the society's use of the property to the exercise of

of this opinion. The society does not claim that the state constitution provides broader protection in this regard than the federal constitution. We further note that, unlike RLUIPA; see 42 U.S.C. § 2000cc-5 (7) (B) (2000); § 52-571b does not expressly define religious exercise to include the use or improvement of real property for the purpose of religious exercise. Finally, there is no indication in the legislative history of § 52-571b that the legislature harbored any special concerns about a statewide pattern of official discrimination against religious uses in the zoning and land use context, or that the legislature intended to provide heightened protection to religious land uses.

Accordingly, although we agree with the conclusion of the District Court in *Murphy* v. *Zoning Commission*, supra, 289 F. Sup. 2d 114, that § 52-571b applies to some forms of government conduct to which RLUIPA does not apply, we do not believe either that the legislature intended that the construction of a place of worship would constitute religious exercise or that, in the absence of evidence of discrimination against a particular religious use or religious uses in general, the application of land use regulations that are intended to protect the public health and safety to such a use generally would be subject to strict scrutiny under the statute. We therefore reject the society's claim that § 52-571b provides broader protection than RLUIPA in this context and conclude that § 52-571b does not apply under the circumstances of this case.

religion by its members, or to differentiate the society's use of the property from similar uses of property by other religious denominations, would impermissibly entangle the courts in the evaluation of religious claims. See *Employment Division, Dept. of Human Resources* v. *Smith,* supra, 494 U.S. 887 ("courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim"). The society has not asserted that a different rule applies under the state constitution.

V

Having concluded that the trial court correctly determined that the commission's denial of the society's application for a special exception did not violate either RLUIPA or § 52-571b, we next must determine whether the court correctly determined that the commission's decision was supported by substantial evidence under the principles applicable to traditional zoning appeals. We conclude that it did.[29]

We begin our analysis by setting forth the standard of review for the denial of an application for a special exception. "We previously have observed that [a] special exception allows a property owner to use his property in a manner expressly permitted by the local zoning regulations. . . . Nevertheless, special exceptions, although expressly permitted by local regulations, must satisfy [certain conditions and] standards set forth in the zoning regulations themselves as well as the conditions necessary to protect the public health, safety, convenience and property values [as required by General Statutes § 8-2]. . . . Moreover, we have noted that the nature of special exceptions is such that their precise location and mode of operation must be regulated because of the topography, traffic problems, neighboring uses, etc., of the site. . . . We also have recognized that, if not properly planned for, [such uses] might undermine the residential character of the neighborhood. . . . Thus, we have explained that the goal of an application for a special exception is to seek permission to vary the use of a particular piece of property

[29] Although we conclude that several of the commission's reasons for denying the society's application were supported by substantial evidence; see parts V C, V E and V F of this opinion; we also conclude that several of the commission's reasons were not supported by substantial evidence. See parts V A, V B and V D of this opinion. We address all of the society's claims because they raise both legal and factual issues that could arise again if the society chooses to resubmit an application for a special exception.

from that for which it is zoned, without offending the uses permitted as of right in the particular zoning district." (Internal quotation marks omitted.) *Municipal Funding, LLC* v. *Zoning Board of Appeals*, 270 Conn. 447, 453–54, 853 A.2d 511 (2004).

"In reviewing a decision of a zoning board, a reviewing court is bound by the substantial evidence rule, according to which . . . [c]onclusions reached by [a zoning] commission must be upheld by the trial court if they are reasonably supported by the record. The credibility of the witnesses and the determination of issues of fact are matters solely within the province of the [commission]. . . . The question is not whether the trial court would have reached the same conclusion . . . but whether the record before the [commission] supports the decision reached. . . . If a trial court finds that there is substantial evidence to support a zoning board's findings, it cannot substitute its judgment for that of the board. . . . If there is conflicting evidence in support of the zoning commission's stated rationale, the reviewing court . . . cannot substitute its judgment as to the weight of the evidence for that of the commission. . . . The agency's decision must be sustained if an examination of the record discloses evidence that supports any one of the reasons given." (Citations omitted; internal quotation marks omitted.) Id., 453. With these principles in mind, we address in turn each of the commission's reasons for denying the society's application for a special exception.

## A

### Temple Design

With respect to the commission's conclusion that the design of the proposed temple violated § 8.04.770 of the regulations because it was not in harmony with the design of other buildings in the vicinity, we agree with the trial court that this was not a valid reason for deny-

ing the application. "[C]ourts have been reluctant to uphold the strict enforcement, against religious uses, of regulations that require special exception uses to be in architectural harmony with the surrounding neighborhood." *Daughters of St. Paul, Inc.* v. *Zoning Board of Appeals*, 17 Conn. App. 53, 67, 549 A.2d 1076 (1988). As the trial court aptly noted in the present case, strict enforcement of such regulations effectively "would prevent [any] 'nontraditional' non-Judeo/Christian religion from building its temple in the town . . . ."

Our review of the architectural renderings that the society had submitted to the commission reveals that the proposed temple is a two-story building with stone facing and a low pagoda-type tile roof. Although the design concededly contains certain details that are not typical of buildings found in a rural New England setting, the proposed temple is generally attractive, relatively modest and not entirely out of character for a place of religious worship in such a neighborhood. Accordingly, we agree with the society that the trial court correctly concluded that the design of the proposed temple did not constitute a valid reason for denying the society's application for a special exception.

B

Traffic Considerations

We next address the commission's conclusion that the society's application should be denied because the proposed use of the property would create additional traffic congestion and hazards on Boggs Hill Road. The following additional facts and procedural history are relevant to our review of this issue. At the October 17, 2002 public hearing on the society's application, Fred M. Greenberg, a traffic engineer, spoke on behalf of the society and submitted a written traffic evaluation in which he stated that a "volume count performed by the [state] [d]epartment of [t]ransportation . . . in 2001

. . . indicated that in the area of the subject site, Boggs Hill Road carried an [a]verage [d]aily [t]raffic . . . volume of [1400] trips. The highest hourly traffic volume of approximately 160 vehicles, or about one every [twenty-two] seconds, occurred between [8 and 9 a.m.]." The proposed use of the property was "estimated to generate [forty to fifty] trips per day, some of which already exist. An alternate development for this size . . . would be four single family homes as zoned. This development would generate about [forty] trips per day."

Greenberg also stated that, "[d]uring a 'special event' weekend day, which [is] planned to occur only five times per year, it is estimated that up to 300 trips [or 150 arrivals and 150 departures] may be generated over the course of the day," with a peak hourly flow of about seventy-five vehicles arriving and seventy-five vehicles departing. Greenberg noted that, "[f]or purposes of comparison to an existing traffic generator, the Head O'Meadow Elementary School, located on Boggs Hill Road to the north . . . would be expected to generate [between 500 and 600] daily trips, and peak hour flows in the [125 to 175] vehicle range." Greenberg stated that, in his opinion, "the traffic demand from [the proposed use] can be readily accommodated."

On the basis of statements and letters submitted to the commission by area residents, a commission member and a town selectman, the commission found that "Boggs Hill Road is a small paved two-lane country road characterized as winding and narrow." The sole entrance from the society's property to the road "is located in the middle of a narrow 'S' shaped section" of the road. "[T]he topography of the curves is notable in that [they] are on a slope, one of the curves is greater than the expected [ninety] degrees and sand/water/ice accumulate on the street. In addition the road is only [twenty-two] feet wide at this point limiting the options for a [driver] attempting to avoid an accident." The

town police receive reports of approximately one motor vehicle accident on the road per month, but "many accidents take place during the course of the year . . . such as destroyed mailboxes and 'fender benders' that go unreported to the police." The commission expressed concern that "during a [f]estival's peak traffic period when multiple cars arrive [at the society's property] at approximately the same time [as] each other from one direction or the other or even both directions at once then parking will begin to detain and slow other arriving vehicles . . . ." Because of the narrow width of the road and limited visibility around the curve, other vehicles traveling along the road would not have sufficient time to stop safely.

The commission also determined that the society's traffic expert had not made himself "familiar with the actual use of the road and did not conduct an actual traffic volume survey at the site. Instead he conducted the survey at an elementary school several miles from the site." The commission "believe[d] that less than [one] half of these vehicles from the school pass the temple site, so the potential increase in 150 cars [per] hour peak travel at the site will be 100 to 200 [percent] versus the forecasted insignificant increase." In addition, the commission concluded that Greenberg had underestimated the dangerous nature of the location on Boggs Hill Road and that his "assumptions concerning use during festival days were inconsistent with other information provided by the [society] regarding the number of cars."[30] Accordingly, the commission concluded that the proposed use of the property did not satisfy the requirements of § 8.04.740 of the regulations.

The trial court determined that the record did not support the commission's conclusion because "[a] reli-

[30] The commission apparently was referring to reports that more than 500 people and 150 cars had been on the property during celebrations in 2000.

gious structure is a permitted use, [and] an increase in traffic does result from [the] same no matter where the church, synagogue or temple is located." Quoting from the opinion of the Appellate Court in *Bethlehem Christian Fellowship, Inc.* v. *Planning & Zoning Commission*, 73 Conn. App. 442, 470, 807 A.2d 1089, cert. denied, 262 Conn. 928, 814 A.2d 379 (2002), the court further concluded that, in any event, "a land use agency cannot deny an application for a permitted use because of off-site traffic considerations." (Internal quotation marks omitted.) Finally, the court determined that the statements submitted by various persons to the commission "regarding the dangers posed by additional traffic under the worst case scenario were based on speculation and did not rise to the level of substantial evidence." Although we disagree that the commission was required to disregard off-site traffic considerations, we nevertheless agree with the trial court that the record does not support the commission's conclusion that those considerations warranted its denial of the society's application.

This court recently has reaffirmed the principle that, when a landowner has submitted an application for a permitted use, the zoning commission may consider off-site traffic conditions "only for the limited purpose of reviewing the internal traffic circulation on the site and determining whether the location of the proposed [roads and driveways] would minimize any negative impact of additional traffic to the existing traffic . . . ." *Pansy Road, LLC* v. *Town Plan & Zoning Commission*, 283 Conn. 369, 380, 926 A.2d 1029 (2007); see also *Friedman* v. *Planning & Zoning Commission*, 222 Conn. 262, 267, 608 A.2d 1178 (1992) (volume of traffic generated by proposed office building was not proper basis for denying site plan application); *TLC Development, Inc.* v. *Planning & Zoning Commission*, 215 Conn. 527, 529, 577 A.2d 288 (1990) (language of town zoning

regulations did not permit off-site traffic considerations to serve as basis for denying site plan application); *Reed* v. *Planning & Zoning Commission*, 208 Conn. 431, 432, 544 A.2d 1213 (1988) (inadequacy of local roads was not proper basis for denying subdivision application). This is because "[t]he designation of a particular use of property as a permitted use establishes a *conclusive presumption* that such use does not adversely affect the district *and precludes further inquiry into its effect on traffic*, municipal services, property values, or the general harmony of the district." (Emphasis in original; internal quotation marks omitted.) *Pansy Road, LLC* v. *Town Plan & Zoning Commission*, supra, 376. This court has limited the application of these principles, however, to site plan approvals and subdivision applications that involve uses that are permitted *as of right* within the zoning district. See id., 371 (plaintiff submitted residential subdivision application in residential zone); see also *Friedman* v. *Planning & Zoning Commission*, supra, 263 (plaintiff sought site plan approval for office building in commercial zone in which such use was permitted); *TLC Development, Inc.* v. *Planning & Zoning Commission*, supra, 528 (plaintiff sought site plan approval for shopping center in zone in which such use was permitted); *Reed* v. *Planning & Zoning Commission*, supra, 432 (plaintiff filed residential subdivision application in residential zone).

In contrast, when a use is not allowed as of right, but only by special exception, the zoning commission "is required to judge whether any concerns, such as parking or traffic congestion, would adversely impact the surrounding neighborhood." *Barberino Realty & Development Corp.* v. *Planning & Zoning Commission*, 222 Conn. 607, 613, 610 A.2d 1205 (1992). The reason for this requirement is that, although such uses "are not as intrusive as commercial uses . . . they do generate parking and traffic problems that, if not prop-

erly planned for, might undermine the residential character of the neighborhood." (Internal quotation marks omitted.) Id., 612–13; see also *Municipal Funding, LLC* v. *Zoning Board of Appeals,* supra, 270 Conn. 454 ("the goal of an application for a special exception is to seek permission to vary the use of a particular piece of property from that for which it is zoned, without offending the uses permitted as of right in the particular zoning district" [internal quotation marks omitted]). Thus, there is no presumption that a specially permitted use, or the traffic that it will generate, necessarily is compatible with any particular neighborhood within the zoning district. *Barberino Realty & Development Corp.* v. *Planning & Zoning Commission,* supra, 616 (off-site traffic congestion can provide basis for denying special permit because, "[u]nlike a site plan application for a permitted use where the commission has already made a determination that such a use is permitted in a particular area, [specially permitted uses are] theoretically allowed in any zone *provided that the proposed [use] meets the standards and regulations set forth in the regulations*" [emphasis added]). To the extent that language in *Bethlehem Christian Fellowship, Inc.* v. *Planning & Zoning Commission,* supra, 73 Conn. App. 470, indicates otherwise,[31] we expressly disavow it.

Courts in other jurisdictions have concluded that, "in order to deny a special permit because of traffic, the project must cause traffic congestion and have a greater impact on the area than other permitted uses for the property not requiring a special permit."[32] R. Fuller, 9B

---

[31] *Bethlehem Christian Fellowship, Inc.* v. *Planning & Zoning Commission,* supra, 73 Conn. App. 444–45, involved an application for a special exception to build a church in a residential zone.

[32] See, e.g., *Miller* v. *Kiwanis Club of Loch Raven, Inc.,* 29 Md. App. 285, 297, 347 A.2d 572 (1975) ("traffic impact on an application for a special exception ought to be measured against that which could arise under permissible use" [internal quotation marks omitted]); *Hobbs* v. *Albanese,* 70 App. Div. 2d 1049, 1050, 417 N.Y.S.2d 556 (1979) (defendant board of trustees lawfully may deny special permit if "proposed use would have a greater

Connecticut Practice Series: Land Use Law and Practice
(3d Ed. 2007) § 49:14, pp. 138–39. The strict application
of this principle, however, would effectively exclude
many specially permitted uses from residential zones
in which they are expressly allowed. Churches and
schools, by their nature, generate different traffic pat-
terns and more intense traffic than residences. Accord-
ingly, we conclude that, if a special permitted use would
have a *significantly* greater impact on traffic conges-
tion in the area than a use permitted as of right, the
additional congestion may provide a basis for denying
the permit. Cf. *Bethlehem Christian Fellowship, Inc.*
v. *Planning & Zoning Commission,* supra, 73 Conn.
App. 470 ("the consideration that applies to zoning
applications is not the overall volume of traffic . . .
but whether the increase in traffic will cause conges-
tion"). Moreover, the significance of the impact should
not be measured merely by the number of additional
vehicles but by the effect that the increase in vehicles
will have on the existing use of the roads. An increase
of 100 vehicles per hour may have a negligible impact
at one time or location and a ruinous impact at another
time or location. In making this determination, the com-
mission may rely on statements of neighborhood resi-
dents about the nature of the existing roads in the
area and the existing volume of traffic, and its own
knowledge of these conditions. See, e.g., *Primerica* v.
*Planning & Zoning Commission,* 211 Conn. 85, 97–98,
558 A.2d 646 (1989).

Applying these principles to the commission's deci-
sion in the present case, we conclude that there are
several flaws in the commission's stated reasons for its

impact on the traffic in the area than would other permitted uses not subject
to special permits"); *Fantastic Plastic, Inc.* v. *Zoning Board of Adjustment,*
16 Pa. Commw. 455, 461, 332 A.2d 577 (1975) (in absence of evidence that
proposed specially permitted use would generate more traffic than permitted
use would generate, zoning administrator abused discretion in denying
permit).

conclusion that the proposed use of the property would cause unacceptable traffic congestion and hazards. First, the commission concluded that Greenberg had not conducted a traffic survey at the property but had relied on a survey conducted at an elementary school several miles away. In Greenberg's traffic evaluation, however, he stated that, in estimating the existinc traffic volume on Boggs Hill Road, he had relied on a traffic volume count performed by the state department of transportation "in the area of the subject site . . . ." In addition, Greenberg stated that he provided the information about traffic flow at the elementary school on Boggs Hill Road "[f]or purposes of comparison to an existing traffic generator . . . ." Greenberg did not state that he relied on the estimates of traffic flow at the elementary school in estimating traffic flow at the society's property, and the commission has referred us to no other evidence that he did so. Accordingly, the record does not support the commission's determination that Greenberg did not rely on a traffic survey at the site.

Second, the commission estimated, apparently on the basis of its own knowledge, that peak traffic flow at the society's property was approximately seventy-five cars per hour, "so the potential increase in 150 cars [per] hour peak travel at the site will be 100 to 200 [percent] . . . ." Greenberg stated in his traffic evaluation, however, that traffic volume at the property on festival days would be 150 vehicles arriving at the property and 150 vehicles leaving the property *per day*, not per hour. Greenberg estimated that the peak traffic volume generated by the property would be seventy-five vehicles *per hour*. Moreover, Greenberg indicated that the peak traffic volume at the property would occur on festival days between 10 and 11 a.m. and again between 3 and 4 p.m. Therefore, peak traffic at the property would not coincide with the existing peak

traffic volume on Boggs Hill Road, which, according to Greenberg, occurred between 8 and 9 a.m. on weekdays. Consequently, the commission's determination that peak traffic volume on Boggs Hill Road would be doubled or tripled is not supported by the record.

We recognize that an additional seventy-five vehicles per hour during peak hours on festival days would constitute a significant increase in traffic volume at those times, and that the total resulting volume at those times might exceed existing peak volume.[33] We also recognize the commission's legitimate concerns about the dangerous conditions on the portion of Boggs Hill Road adjacent to the property. Nevertheless, in the absence of any determination by the commission that an increase of seventy-five vehicles per hour at peak hours on festival days would increase traffic congestion or hazards on Boggs Hill Road significantly more than a permitted use of the property would, we agree with the trial court that the evidence was inadequate to support the commission's conclusion that the society's proposed use of the property did not satisfy § 8.04.740 of the regulations.

C

General Character of the Neighborhood

We next address the commission's conclusion that the proposed use was not in harmony with the general character of the neighborhood in violation of § 8.04.720 of the regulations.[34] The following additional facts and procedural history are relevant to our review of this

---

[33] According to Greenberg, average traffic volume on Boggs Hill Road is 1400 vehicles per weekday, with a peak of 160 vehicles per hour. He did not provide information on the average hourly volume for nonpeak weekday hours or weekends.

[34] We note that the trial court, in its memorandum of decision, did not address the commission's findings that the proposed use of the property would be disruptive to the neighborhood but concluded only that the design of the proposed temple was not a sufficient basis for the commission's denial of the society's application.

ground for denial of the society's application. Numerous members of the public spoke at the October 17 and December 9, 2002 public hearings on the society's application and submitted letters to the commission. Many neighboring residents complained that, in the years since the society had purchased the property, it had held a series of daylong and weekend long events involving crowds of up to 500 people and 150 cars. Outdoor loudspeakers had been used at the events to play amplified "pop" music that could be heard one-half mile away. One neighboring resident had indicated that these disruptive events had occurred every weekend, and, as a result, he and his family had been forced to move. After receiving complaints about the events, the town's zoning officer had sent letters to the society on May 13, 1999, and October 6, 2000, informing the society that it could not conduct religious services on the property without obtaining approval for a special exception. The events continued, however, and, on April 17, 2001, the zoning enforcement officer issued a formal cease and desist letter ordering the society to stop conducting religious services until it obtained approval for a special exception.

Richard T. Coburn, a resident at 141 Boggs Hill Road, submitted to the commission a petition in opposition of the special permit application signed by 1253 residents from the surrounding area. The petition expressed concern over the lack of information about the number of people who would be using the proposed temple, increased traffic, excessive noise and potential well and septic problems. Robert N. Cox, a resident of 153 Boggs Hill Road, submitted a letter to the commission stating that a Cambodian Buddhist temple in the town of Chelmsford, Massachusetts, had scheduled events for fifteen Buddhist festivals over the course of one year, several of which were scheduled to take place over multiple days. Ten of these festivals were of a type that

might be held on the society's property. These festivals were scheduled to run from 7 a.m. to 9:30 p.m. on the first day and to begin at 4 a.m. on the second day. Cox stated that, in light of this information, he was skeptical that the society intended to hold only five one day festival celebrations at the proposed temple.

After the October 17, 2002 hearing, the commission asked the society to respond to the concerns raised by the neighboring residents. Robert C. Schechinger, Jr., the society's architect, submitted a letter to the commission in which he stated that, over the course of one year, there would be five major festivals at the temple, one of which would last three days, and seven minor holiday celebrations. Schechinger stated that the society believed that fewer than 450 people would attend the major festivals. He did not indicate how many people would attend the "minor" celebrations. He stated that there would be no music during the celebrations except for chanting during a ceremonial march around the balcony on the second floor of the temple, which would last for approximately one-half hour. The only other planned activities at the temple would be weekend prayer activities and religion and language classes for groups of fewer than seventy-five people. Schechinger also indicated that, if vehicles exceeded the temple's parking capacity for any particular festival, cars would be turned away, and the society would rent a hall for that festival the following year.

In its letter to the society announcing the denial of the society's application, the commission stated that the society originally had indicated that ten to fifteen people would visit the temple on weekdays, thirty to fifty people would visit on weekends, and that the temple would hold four annual festivals for up to 450 people on weekends during the daylight hours. The commission stated that, although "[t]his . . . seemed acceptable," "upon closer examination . . . this is a very

sanitized version as to what is to be expected." Specifically, the commission expressed concerns that, since the neighboring residents had raised questions at the public hearings about the number of festivals that would be held at the proposed temple, the society had revised its position and stated that there would be not five, but twelve, annual festivals, some occurring over multiple days. The commission also noted the complaints about the previous events at the property and the zoning enforcement letters that had been issued to the society in connection with those events. Finally, the commission observed that the society had indicated that it anticipated an increase in its membership by 700 to 800 people.

On the basis of this evidence, the commission stated that it had "doubts that the [society was] forthcoming with [its] intentions for [the] facility. During the public hearings, the [society] was reluctant to provide answers to [the commission's] questions and provided vague information about the festivals and functions that [had been] planned." The commission concluded that "[t]he level of continuous activity that will take place at the proposed site is inconsistent with the harmony of the general character of the neighborhood."

We conclude that there was evidence in the record to support the commission's conclusion that attendance at previous events on the society's property had exceeded 450 people and 148[35] cars, and that the events had been highly disruptive to the neighborhood. The record also supported the conclusion that the society would hold twelve festivals over the course of one year, essentially on a monthly basis, and that the number of persons attending at least some of these festivals could

---

[35] This number represents the number of parking spaces that the society intended to establish on the property.

exceed 450.[36] Although the society maintained that the celebrations would be held indoors, the commission reasonably could have concluded that, especially during the warm weather months, the 450 attendees would not remain inside the temple's 6000 square foot meeting hall over the course of an entire day or multiple days but, as they had in the past, would take the opportunity to enjoy the entire site, which had been chosen for its pleasant pastoral qualities. In addition, although we have concluded that the commission's determination that temple traffic would create undue traffic congestion and a traffic safety hazard was not supported by substantial evidence, the commission reasonably could have concluded that a parking lot for 148 cars would be a significant source of noise and disruption in the neighborhood. We conclude that this evidence supported the conclusion that the activities at the proposed temple would cause a significantly greater disruption to the neighborhood than any permitted use of the property would, and, therefore, the proposed use clearly was not in harmony with the general character of the neighborhood. We conclude, therefore, that the commission's decision that the proposed use violated § 8.04.710 of the regulations was supported by substantial evidence.

D

Intent and Purpose of the Regulations

We next address the commission's determination that the proposed use of the property would be inconsistent with the intent and purpose of the town's zoning provi-

---

[36] The record does not appear to support the commission's statement that the society anticipated that its membership would increase by 700 to 800 members. When asked about this figure at the December 9, 2002 public hearing, Pinith Mar stated that, when he had mentioned the figure at an earlier hearing, he had meant only to suggest that *if* membership increased beyond what the new temple could accommodate, the society was aware that it would have to celebrate the festivals at another location.

sions in violation of § 8.04.720 of the regulations because the evidence presented at the hearings established that the society intended to use the property as a "tele-medicine treatment site" for psychiatric evaluation and treatment, which was not a permissible use in a residential zone.[37] The evidence on which the commission relied in support of this finding was an article that appeared in The Hartford Courant on June 27, 2002, in which it was reported that Khmer Health Advocates, a social services agency serving the Cambodian community in Connecticut, had obtained a $380,000 federal matching grant to create a network of satellite health services offices, one of which was to be located at the "Cambodian Buddhist [temple] in Newtown . . . ." In a letter to the commission dated November 26, 2002, Me denied the report, stating that the society had "determined . . . that the . . . proposed temple would not be suitable as a . . . satellite site" and that such a use "would disrupt" the society's development program for the temple. Me further stated that The Hartford Courant never had contacted the society to verify the accuracy of the information contained in its article.

We conclude that, if the proposed use of the property as a temple otherwise complied with all applicable zoning regulations, the mere possibility that the temple would be used for an impermissible purpose would not be a legitimate ground for denying the application. See *Irwin* v. *Planning & Zoning Commission*, 244 Conn. 619, 628, 711 A.2d 675 (1998) ("[a] zoning commission does not have discretion to deny a special permit when the proposal meets the [applicable] standards"). In the absence of any evidence that the proposed permissible use was pretextual or that the society deliberately misled the commission, we cannot conclude that the newspaper article constituted substantial evidence that the

---

[37] We note that the trial court did not address this ground for the commission's denial of the society's application in its memorandum of decision.

society intended to use the property for an impermissible purpose if its application for a special exception were approved.

## E

### Property Values

We next address the commission's determination that the proposed use of the property would substantially impair property values in the neighborhood in violation of § 8.04.730 of the regulations. The society presented a report by Calciano and Stern Appraisal Associates, Inc., a real estate appraisal firm, in which that firm opined that "[the proposed temple] will have no impact on the '[quiet] enjoyment,' utility, or market value of the surrounding properties." In reaching this conclusion, the firm had used a "matched pair analysis" under which it compared sales of residential properties in other Newtown neighborhoods near existing religious facilities to sales of similar properties where there was no religious facility. It also used a "comparative market analysis" pursuant to which it examined the impact of similarly intense nonresidential uses on residential neighborhoods.

The commission also heard evidence that a family in the neighborhood of the proposed temple had been forced to move as a result of past activities there. When that residence was sold, realtors had inquired whether it was near the society's property, leading the family to believe that the location had made it more difficult to sell the property.[38] In addition, the commission heard

---

[38] The commission stated in its decision denying the society's application that Howard Wood and Mona Wood had made these statements in a letter presented to the commission at the December 9, 2002 public hearing. Although that letter is not included in the return of record, the transcript of the December 9, 2002 hearing reveals that the letter was discussed at the hearing and that a commission member had asked society members about it.

evidence that a potential purchaser had canceled plans to buy a property when he learned that the property was near the proposed temple.

The commission concluded that the society's appraisal report was of little value because the comparable sales on which the report relied were in the vicinity of churches that had "far fewer members than the participants expected at the temple" and lower levels of continuous activity. It further concluded that "[t]he specific examples provided by the neighbors [were] more persuasive." Accordingly, the commission concluded that the level of activity at the proposed temple would substantially impair neighboring property values.

As we have indicated, "[t]he credibility of the witnesses and the determination of issues of fact are matters solely within the province of the [commission]." (Internal quotation marks omitted.) *Municipal Funding, LLC* v. *Zoning Board of Appeals*, supra, 270 Conn. 453. Accordingly, the commission was not required to credit the appraisal firm's conclusion that the proposed temple would have no effect on property values. Similarly, the commission was entitled to credit the anecdotal reports that past activities on the society's property had made neighboring properties less desirable. We already have concluded that the commission's determination that those activities would cause a significantly greater disruption to the neighborhood than any permitted use was supported by substantial evidence. Moreover, it is reasonable to conclude that the effect of the activities on the sale of neighboring properties would continue if the activities were allowed to continue. We therefore conclude that the commission's determination that the disruptive activities would significantly impair property values was supported by substantial evidence.

## F

## Health and Safety Considerations

Finally, we address the commission's conclusion that the proposed use of the property did not comply with § 8.04.750 of the regulations, which requires that "[t]he proposed use shall not create a health or safety hazard to persons or property on or off the lot on which the use is proposed," because the society had not established that the proposed subsurface wastewater system or private water system would meet the public health code. The following additional facts are necessary to our resolution of this issue. Wilson Alford, an engineer, spoke at the October 17, 2002 hearing on behalf of the society and stated that the proposed septic system for the temple would have no impact on neighboring properties if properly designed and installed. Bart Clark, an engineer employed by Oakwood Environmental Associates, appeared at the December 9, 2002 hearing and submitted a letter prepared on behalf of the Newtown Residential Preservation Society in which he stated that the proposed septic system did "not appear to comply with standard procedures required by the [s]tate [h]ealth [c]ode" and identified potential deficiencies. John R. Trautman, an ecological consultant, also spoke at the December 9, 2002 hearing and indicated that he did not believe that the septic system would function properly as designed.

At the time of the hearings, the society had not obtained approval from the state department of public health (department) for the plans for the septic system. The record nevertheless reveals that the society received a letter from the department dated February 20, 2003, stating that the plans for the proposed septic system "were found to be generally satisfactory and in accordance with the requirements of the Public Health Code." The department approved the plans with certain

stipulations and modifications. The department also stated that "[t]he [d]rinking [w]ater [d]ivision of the [d]epartment of [p]ublic [h]ealth must be contacted regarding water supply matters since the facility is likely to be classified as a public water system. This office does not recommend approval until all water supply matters have been addressed." It is unclear from the record, however, when this letter was submitted to the commission and, in particular, whether the commission considered the letter in denying the society's application at its February 20, 2003 regular meeting.

A zoning commission generally is not authorized to grant land use applications conditioned on the approval of another agency over which the commission has no control. See, e.g., *River Bend Associates, Inc.* v. *Planning Commission*, 271 Conn. 41, 56, 856 A.2d 959 (2004) ("commission action which is dependent for its proper functioning on action by other agencies over which the zoning commission has no control cannot be sustained unless the necessary action appears to be a probability" [internal quotation marks omitted]). This general principle, however, does not apply to applications for special exceptions. See *Lurie* v. *Planning & Zoning Commission*, 160 Conn. 295, 307, 278 A.2d 799 (1971) (when "an exception . . . is granted and the grant is otherwise valid except that it is made reasonably conditional on favorable action by another agency or agencies over which the zoning authority has no control, its issuance will not be held invalid solely because of the existence of any such condition").

In the present case, the trial court concluded that, under *Lurie*, it would have been within the commission's discretion to grant the society's application conditioned on the department's approval of the society's proposed septic and water supply systems, but the commission was not *required* to do so. We agree. Although conditional approvals of applications for special excep-

tions are permissible, they are not required. Because the society had not obtained approval of its proposed septic and water supply systems when it submitted its application to the commission, and because there was evidence from which the commission could have concluded that those systems would have created a health risk, we conclude that the commission's determination that the proposed use constituted a potential health or safety hazard was supported by substantial evidence.

### G

### Conclusion

In summary, we conclude that the trial court correctly determined that the record did not contain substantial evidence to support the commission's conclusion that the society's application for a special exception should be denied because the design of the temple was not in harmony with the design of other buildings in the vicinity and because the temple would create unacceptable traffic congestion and hazards. We also conclude that the record is insufficient to support the determination of the commission that the society intended to use the property as a satellite health services office, which the commission relied on in denying the society's application. We further conclude, however, that the record contained substantial evidence to support the commission's denial of the society's application on the grounds that the level of activity at the proposed temple would not be in harmony with the general character of the neighborhood, that the temple would substantially impair neighboring property values, and that the proposed septic wastewater and water supply systems would create a health or safety hazard. We therefore conclude that the trial court properly denied the society's appeal.

The judgment is affirmed.

In this opinion the other justices concurred.