******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

MITCHELL VAZQUEZ *v.* TERI BUHL ET AL.
(AC 35319)

DiPentima, C. J., and Keller and Mihalakos, Js.

*Argued November 22, 2013—officially released May 13, 2014*

(Appeal from Superior Court, judicial district of Stamford-Norwalk, Hon. David R. Tobin, judge trial referee [motion to strike]; Hon. A. William Mottolese, judge trial referee [motion for judgment].)

*Ryan O'Neill*, with whom, on the brief, was *Mark Sherman*, for the appellant (plaintiff).

*Erik Bierbauer*, pro hac vice, with whom were *Alan Neigher* and, on the brief, *Sheryle S. Levine*, for the appellee (defendant NBCUniversal, Inc.).

*Opinion*

DiPENTIMA, C. J. In this appeal, we confront Congress' restrictions on defamation claims arising out of the Internet. The plaintiff, Mitchell Vazquez, appeals from the judgment of the trial court rendered after the granting of the motion brought by the defendant NBCUniversal Inc.,[1] to strike counts two (defamation), three (false light), and four (negligent infliction of emotional distress) of the plaintiff's complaint. On appeal, the plaintiff claims that a motion to strike is not the proper procedural vehicle to decide the applicability of § 230 of the Communications Decency Act of 1996 (CDA), 47 U.S.C. § 230 et seq. The plaintiff further claims that the trial court improperly granted the motion to strike because it incorrectly interpreted the "provided by another information content provider" language of § 230 (c) (1). We affirm the judgment of the trial court.[2]

The complaint alleges the following facts.[3] In December, 2011, and January, 2012, Teri Buhl published several online news articles containing defamatory statements about the plaintiff on her website. On January 6, 2012, John Carney, a senior editor for cnbc.com, published an online article entitled, "The Sex and Money Scandal Rocking Hedge Fund Land" on www.cnbc.com, a website owned and operated by the defendant. Carney's article referred to Buhl as a "veteran financial reporter" who "knows her way around the Connecticut hedge fund beat," and urged viewers to read Buhl's articles by stating, "I don't want to steal Buhl's thunder, so click on her report for the big reveal." The word "report" was a hyperlink[4] to Buhl's online articles containing the defamatory statements.[5]

On January 25, 2012, the plaintiff filed his five count complaint against Buhl and the defendant.[6] In count two, the plaintiff alleged a per se defamation claim against the defendant. He alleged that Carney's article "published, distributed, endorsed and promoted" the defamatory statements contained in Buhl's articles because it hyperlinked to Buhl's articles, validated Buhl's credibility, and claimed that Buhl had "made thunder by publishing her article." (Internal quotation marks omitted.) In count three, the plaintiff alleged a false light claim.[7] In count four, he alleged a negligent infliction of emotional distress claim.

On April 16, 2012, the defendant moved to strike the complaint, asserting, inter alia, that the CDA barred all counts alleged against it. On May 25, 2012, the plaintiff filed an objection to the motion to strike with an accompanying memorandum of law, to which he attached Carney's article.

The court heard oral argument on the motion, and in a subsequent memorandum of decision, granted the defendant's motion to strike. The court first concluded

that a motion to strike was the appropriate vehicle to address the applicability of the CDA. The court further held that the defendant was protected under the CDA because it was a provider of an interactive computer service, the defamatory statements were created by Buhl, another information content provider, and the plaintiff sought to treat the defendant as the publisher of the defamatory statements. On December 17, 2012, the court granted the plaintiff's motion for judgment in favor of the defendant. This appeal followed.

We begin with the background of the CDA. Although no Connecticut state court has done so, several other state and federal courts have discussed the purpose behind the CDA in great detail. See, e.g., *Batzel* v. *Smith*, 333 F.3d 1018, 1026–30 (9th Cir. 2003), cert. denied, 541 U.S. 1085, 124 S. Ct. 2812, 159 L. Ed. 2d 246 (2004); *Zeran* v. *America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997), cert. denied, 524 U.S. 937, 118 S. Ct. 2341, 141 L. Ed. 2d 712 (1998). "Congress enacted the CDA as Title V of the Telecommunications Act of 1996, Pub. L. No. 104-104, primarily to protect minors from exposure to obscene and indecent material on the Internet. *See* S. Rep. No. 104-23, at 187–193 (1996) (noting that Congress has been troubled by an increasing number of published reports of inappropriate uses of telecommunications technologies to transmit pornography, engage children in inappropriate adult contact, terrorize computer network users through electronic stalking and seize personal information) . . . .

"At the same time, however, Congress was also concerned with ensuring the continued development of the Internet. *See* 47 U.S.C. § 230 (b). Section 230 . . . was enacted based on a congressional concern that treating providers of computer services the same way as traditional publishers would impede the development of the Internet. Accordingly, Congress, [w]hether wisely or not . . . made the legislative judgment to effectively immunize providers of interactive computer services from civil liability in tort with respect to material disseminated by them but created by others. *Blumenthal* v. *Drudge*, 992 F. Supp. 44, 49 (D.D.C. 1998); *see also* [*Batzel* v. *Smith*, supra, 333 F.3d 1026] (noting that, in Section 230, Congress made a policy decision to treat providers of third-party content on the Internet differently than non-electronic providers of third-party content, such as newspapers)." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Atlantic Recording Corp.* v. *Project Playlist, Inc.*, 603 F. Supp. 2d 690, 699 (S.D.N.Y. 2009).

Section 230, in relevant part, provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230 (c) (1). Likewise, it provides that "[n]o cause of action may be brought and no liability may be

imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230 (e) (3). Of relevance here, it defines an "information content provider" to be "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230 (f) (3). It defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230 (f) (2). With this statutory background in mind, we turn to the plaintiff's specific claims.

I

The plaintiff first claims that the applicability of the CDA should not have been decided on a motion to strike. His premise for this argument is that to invoke the CDA, the defendant must have pleaded it as a special defense. The plaintiff also argues that he should not have been required to predict and address the CDA when pleading allegations in his complaint and should have been afforded the opportunity to conduct discovery. The defendant refutes such a premise and counters that, on the face of the complaint, it was protected under the CDA, and thus, a motion to strike was the proper procedural vehicle in this matter. Alternatively, the defendant argues that, should we treat the invocation of the CDA as a special defense, this case is analogous to those where our Supreme Court has permitted use of a motion to strike to determine issues of governmental immunity. See, e.g., *Violano* v. *Fernandez*, 280 Conn. 310, 907 A.2d 1188 (2006). We conclude that the defendant was not required to plead the CDA as a special defense and that the plaintiff's claims were properly decided on a motion to strike.

We begin with a brief discussion of relevant legal principles. "The purpose of a motion to strike is to contest . . . the legal sufficiency of the allegations of any complaint . . . to state a claim upon which relief can be granted. . . . [S]ee Practice Book § 10-39. A motion to strike challenges the legal sufficiency of a pleading, and, consequently, requires no factual findings by the trial court. . . . We take the facts to be those alleged in the complaint . . . and we construe the complaint in the manner most favorable to sustaining its legal sufficiency. . . . Thus, [i]f facts provable in the complaint would support a cause of action, the motion to strike must be denied. . . . A motion to strike is properly granted if the complaint alleges mere conclusions of law that are unsupported by the facts alleged." (Citations omitted; internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC* v. *Alves*,

262 Conn. 480, 498, 815 A.2d 1188 (2003).

By comparison, "[a]s a general rule, facts must be pleaded as a special defense when they are consistent with the allegations of the complaint but demonstrate, nonetheless, that the plaintiff has no cause of action. . . . No facts may be proved under either a general or special denial except such as to show that the plaintiff's statements of fact are untrue. Facts which are consistent with such statements but show, notwithstanding, that the plaintiff has no cause of action, must be specially alleged. . . . Practice Book § 10-50. If a party seeks to introduce evidence under a denial which is consistent with a prima facie case, but nevertheless would tend to destroy the cause of action, the new matter must be affirmatively pleaded as a special defense." (Citation omitted; internal quotation marks omitted.) *Mitchell* v. *Guardian Systems, Inc.*, 72 Conn. App. 158, 166–67, 804 A.2d 1004, cert. denied, 262 Conn. 903, 810 A.2d 269 (2002).

Because this claim raises an issue of law over whether the appropriate procedural vehicle was used, our review is plenary. See *Multari* v. *Yale-New Haven Hospital, Inc.*, 145 Conn. App. 253, 258, 75 A.3d 733 (2013); see also *Larobina* v. *McDonald*, 274 Conn. 394, 399–402, 876 A.2d 522 (2005). We conclude that the applicability of the CDA was properly decided on a motion to strike. Here, the invocation of the CDA did not require a special defense because the defendant did not have to plead any facts to demonstrate that the plaintiff had no cause of action. See *Mitchell* v. *Guardian Systems, Inc.*, supra, 72 Conn. App. 166–67. The plaintiff conceded that the defendant was a "provider of an interactive computer service." He further conceded that his claims sought to treat the defendant as a publisher or speaker. And as we conclude in part II of this opinion, the defamatory statements had been "provided by another information content provider." Accordingly, the plaintiff's allegations were legally insufficient to overcome the exception to liability under the CDA. See 47 U.S.C. § 230 (c) (1) and (d) (3).

Nonetheless, the plaintiff argues that whether the defendant is protected under the CDA is a question of fact that cannot be fairly resolved on a motion to strike. According to the plaintiff, deciding the CDA issue at the pleadings stage unfairly deprived him of the opportunity to conduct discovery and have such questions answered as: "Did Mr. Carney agree with Buhl in advance to add language which would enhance her credibility and draw additional attention to the [d]efamatory [a]rticle?" or "Did Mr. Carney promise Buhl that he would publicize the [d]efamatory [a]rticle in exchange for something of value to Mr. Carney." We disagree for reasons set forth in *Violano* v. *Fernandez*, supra, 280 Conn. 324–26.

In a comparable context, the court in *Violano*

addressed whether liability under the doctrine of qualified governmental immunity could be resolved on a motion to strike. The court determined that "[w]here it is apparent from the face of the complaint that the municipality was engaging in a governmental function while performing the acts and omissions complained of by the plaintiff, the defendant is not required to plead governmental immunity as a special defense and may attack the legal sufficiency of the complaint through a motion to strike." (Internal quotation marks omitted.) Id., 321. In rejecting a claim that such a practice was unfair because it precluded discovery, the court supported its conclusion by observing that the plaintiffs could have asked to stay temporarily the motion to strike pending limited discovery, could have objected to the motion on the ground that they needed the opportunity to plead additional facts, or could have sought to revise their complaint to allege facts that would bring the complained of acts within the recognized exceptions to qualified governmental immunity. Id., 325–26.

Here, the plaintiff had similar opportunities. He could have requested limited discovery, could have asked for time to plead additional facts, and could have sought to revise his complaint to allege additional facts, either after the motion to strike was filed or after the court granted the motion. See id., 326; Practice Book § 10-44. Having declined these opportunities, the plaintiff cannot now claim unfairness.

For these reasons, the court did not err when it concluded that the applicability of the CDA could properly be decided on a motion to strike.

## II

We now turn to the interpretation of the relevant provision of the CDA. The parties agree that the defendant is a provider of an "interactive computer service" because it is a website operator. See *Fair Housing Council of San Fernando Valley* v. *Roommates.com, LLC*, 521 F.3d 1157, 1162 n.6 (9th Cir. 2008) ("the most common interactive computer services are websites"); *Universal Communication Systems, Inc.* v. *Lycos, Inc.*, 478 F.3d 413, 419 (1st Cir. 2007) (website "operators . . . are providers of interactive computer services within the meaning of Section 230"). The parties also agree that the plaintiff seeks to treat the defendant as a "publisher or speaker" of the allegedly actionable statements. The dispute between the parties focuses on the phrase "provided by another information content provider" in § 230 (c) (1). In part II A of this opinion, we consider the meaning of the phrase "provided by," and in part II B of this opinion, the meaning of the phrase "information content provider."

We begin by setting forth the appropriate standard of review and the process by which we interpret federal statutes. Statutory construction is a question of law

and, therefore, our review is plenary. See, e.g., *Mayfield* v. *Goshen Volunteer Fire Co.*, 301 Conn. 739, 744, 22 A.3d 1251 (2011). "With respect to the construction and application of federal statutes, principles of comity and consistency require us to follow the plain meaning rule for the interpretation of federal statutes because that is the rule of construction utilized by the United States Court of Appeals for the Second Circuit. . . . *Dark-Eyes* v. *Commissioner of Revenue Services*, 276 Conn. 559, 571, 887 A.2d 848, cert. denied, 549 U.S. 815, 127 S. Ct. 347, 166 L. Ed. 2d 26 (2006). If the meaning of the text is not plain, however, we must look to the statute as a whole and construct an interpretation that comports with its primary purpose and does not lead to anomalous or unreasonable results." (Internal quotation marks omitted.) *Cambodian Buddhist Society of Connecticut, Inc.* v. *Planning & Zoning Commission*, 285 Conn. 381, 400–401, 941 A.2d 868 (2008).

A

The plaintiff argues that the words "provided by" imply that a "provider or user of an interactive computer service" can invoke the protection of § 230 (c) (1) only where, unlike here, "information" has been *directly transmitted* to them in their role as an interactive computer service provider. See 47 U.S.C. § 230 (c) (1). So, for example, according to the plaintiff's construction, the defendant would have been able to invoke the protection of § 230 (c) (1) had Buhl directly transmitted, posted, or "provided" her article to it as operator of a chat room, message board, blog, or website; but not where the defendant itself discovered the articles and posted a hyperlink to them on its website. We are not persuaded.

We iterate the relevant language of the statute. Section 230 (c) (1) provides: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." According to one dictionary, the definition of "provide" is to: "make (something) available" or "supply (something that is wanted or needed) . . . ." Merriam-Webster's Collegiate Dictionary (11th Ed. 2003). This ordinary meaning of "provided" is clarified within the context of a library. When it places books on its shelves, a library provides them to its readers. This does not change when it later checks them out to individual readers. Under both scenarios, it has provided its books; all that has changed in the second scenario is that we know specifically to whom it provided the books. In this case, as when the library places books on its shelves, Buhl provided, without knowing specifically to whom, the allegedly defamatory statements by posting them to her website. Of course, if Buhl had directly posted the defamatory statements on the defendant's website, she also would have provided the statements. That "provided" *can*

refer to the specific "provider or user" seeking the protection of § 230 (c) (1) does not mean it *must* do so. Thus, the meaning of "provided" in § 230 (c) (1), although not plain and unambiguous, is broader than the plaintiff maintains.

The plaintiff argues, however, that his narrow reading of "provided" must be correct because Congress could have used words like "created" or "originated," if it had intended to shelter providers or users in cases where information was not directly transmitted to them. We are not persuaded. The fact that Congress could have used clearer words does not mean that we can ignore the most natural reading of the words it did use. Our role is to interpret statutes as they were written, not as they could have been written.

Furthermore, case law provides little support for the plaintiff's position. Although few courts have directly interpreted the words "provided by," many courts have confronted comparable factual scenarios and consistently have found interactive computer service providers protected by § 230. In *Atlantic Recording Corp.* v. *Project Playlist, Inc.*, supra, 603 F. Supp. 2d 690, for example, the United States District Court for the Southern District of New York addressed whether a defendant website operator was protected under § 230 (c) (1) when it searched the Internet for songs on third party websites and then provided hyperlinks to those songs. Id., 692, 699. The court there held that the defendant was entitled to protection under § 230 and agreed with other courts that had held that "an interactive computer service is not liable where it posts or links to a third-party's content." Id., 700; id., 701–702. Similarly, in *Parker* v. *Google, Inc.*, 422 F. Supp. 2d 492 (E.D. Pa. 2006), a plaintiff brought various tort actions seeking to hold Google liable for, among other things, that its well established search engine, upon a user's query, produces a list of hyperlinks to third party content. Id., 500–501. The United States District Court for the Eastern District of Pennsylvania explained that Google "archived, cached, or simply provided access to content that was created by a third party" and, thus, concluded that it was protected by § 230 (c) (1). Id., 501. Finally, in *Barrett* v. *Fonorow*, 343 Ill. App. 3d 1184, 799 N.E.2d 916 (2003), leave to appeal denied, 207 Ill. 2d 597, 807 N.E.2d 973 (2004), a case that is similar to the present one, a website operator was afforded protection under § 230 despite personally posting to his website ten articles, written by a third party, containing allegedly defamatory content.

We find no appreciable difference between this case and the case law cited. To be sure, those cases did not directly consider the language at issue here. They did, however, consider analogous factual allegations, and thus, indirectly rejected the arguments presented here. In any event, these cases are persuasive authority,

although not controlling authority, in support of our interpretation of the statutory language.

Nevertheless, the plaintiff seeks to depart from this precedent and cites *Batzel* v. *Smith*, supra, 333 F.3d 1018, in support of his claim. There, the editor of an e-mail newsletter received an allegedly defamatory e-mail from a third party. Id., 1021. After making minor changes, the editor incorporated the third party's e-mail into the next issue of his newsletter, which he then e-mailed to his subscribers. Id., 1022. In a defamation action against the editor, the United States Court of Appeals for the Ninth Circuit had occasion to interpret the word "provided" in § 230 (c) (1), because the third party claimed that he never intended to have his e-mail posted online. Id., 1032. A split panel held that "a service provider or user is immune from liability under § 230 (c) (1) when a third person or entity that created or developed the information in question furnished it to the provider or user under circumstances in which a reasonable person in the position of the service provider or user would conclude that the information was *provided for publication on the Internet* or other 'interactive computer service.' " (Emphasis added.) Id., 1034.

The plaintiff's reliance on *Batzel* is misplaced. The Ninth Circuit was not concerned with whether the third party had directly transmitted the e-mail to the editor of the newsletter (because he did), but instead, was cautious about expanding the scope of § 230 (c) (1) for "speech never meant to be broadcast over the Internet." Id., 1033. It was in this context that the court reasoned: " '[p]rovided' suggests, at least, some active role by the 'provider' in supplying the material to a 'provider or user of an interactive computer service.' " Id., 1032. Because Buhl's article was undoubtedly meant to be disseminated on the Internet, the same concern does not exist here. As a result, *Batzel* is distinguishable.

Our interpretation also squares with the findings and policies expressed by Congress in promulgating § 230. In its findings, Congress commended the "rapidly developing array" of Internet services for offering "users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops." See 47 U.S.C. § 230 (a) (1) and (2). Congress further explicated its policy as one to "promote the continued development of the Internet" and "preserve the vibrant and competitive free market that presently exists for the Internet . . . unfettered by Federal or State regulation . . . ." See 47 U.S.C. § 230 (b) (1) and (2).

These expressions of congressional intent reflect a federal policy favoring the unfettered development of the Internet. See *Batzel* v. *Smith*, supra, 333 F.3d 1027–28. Congress, in 1996, likely could not have anticipated the advent and popularity of Twitter, Facebook or eBay, the shift from print to online news, the proliferation of

search engines, or the myriad other developments of the Internet. Indeed, Congress intentionally drafted § 230 without knowing precisely how the Internet would evolve, but encouraging its "continued development." For these reasons, we reject the plaintiff's suggestion that Congress intended to limit § 230 to only those situations where information is directly transmitted to a provider of an interactive computer service. Congress wrote § 230 with the view that the development of the Internet would be unpredictable. Accordingly, § 230 encompasses a wide range of situations, including situations beyond those in which information is directly transmitted to a provider. Our broader reading of "provided by" is in line with Congress' stated findings and policies.

On the basis of the statutory text, relevant case law, and federal findings and policies stated previously, we reject the plaintiff's interpretation of "provided by" in § 230 (c) (1).[8]

B

The plaintiff finally claims that the defendant should not be protected under § 230 (c) (1) because it became an "information content provider." See 47 U.S.C. § 230 (c) (1) ("[n]o provider . . . shall be treated as the publisher or speaker of any information provided by *another* information content provider" [emphasis added]). Specifically, in a multileveled approach, the plaintiff argues that the defendant became an "information content provider" when it: (1) took active steps to ensure the presentation of the defamatory statements by finding Buhl's articles over the Internet and deciding to hyperlink to them; (2) amplified Buhl's articles by adding a "salacious" title and personal commentary to its own article; and (3) endorsed and adopted the defamatory statements by vouching for Buhl's credibility and suggesting that "she made 'thunder' . . . ." We find that these actions, individually or in combination, did not transform the defendant into an information content provider of the allegedly actionable statements.

"An entity can be both an 'interactive computer service' and an 'information content provider.' . . . However, '[t]he critical issue is whether . . . [the interactive computer service] acts as an information content provider with respect to the information' at issue. . . . While an overt act of creation of content is easy to identify, determining what makes a party responsible for the 'development' of content under § 230 (f) (3) is unclear, and the CDA does not define the term." (Citations omitted.) *Ascentive, LLC* v. *Opinion Corp.*, 842 F. Supp. 2d 450, 474 (E.D.N.Y. 2011).

Against this backdrop, we begin with the language of 47 U.S.C. § 230 (f) (3), which provides in relevant part: "The term 'information content provider' means any person or entity that is responsible, in whole or in

part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230 (f) (3). Three Courts of Appeals have read that statutory language slightly differently, but ultimately they are in general accord. See *Fair Housing Council of San Fernando Valley* v. *Roommates.com, LLC*, supra, 521 F.3d 1157; *Federal Trade Commission* v. *Accusearch, Inc.*, 570 F.3d 1187 (10th Cir. 2009) *Universal Communication Systems, Inc.* v. *Lycos, Inc.*, 478 F.3d 413 (1st Cir. 2007).

In a case concerning the liability, under the Fair Housing Act, of a website designed to pair lessors with lessees, the United States Court of Appeals for the Ninth Circuit underscored the claim raised here. See *Fair Housing Council of San Fernando Valley* v. *Roommates.com, LLC*, supra, 521 F.3d 1157. "It's true that the broadest sense of the term 'develop' could include . . . just about any function performed by a website. But to read the term so broadly would defeat the purposes of section 230 by swallowing up every bit of the immunity that the section otherwise provides. At the same time, reading the exception for co-developers as applying only to content that originates entirely with the website . . . ignores the words 'development . . . in part' in the statutory passage 'creation *or development* in whole *or in part*.' 47 U.S.C. § 230 (f) (3) . . . . We believe that both the immunity for passive conduits and the exception for co-developers must be given their proper scope and, to that end, we interpret the term 'development' as referring not merely to augmenting the content generally, but to *materially contributing* to its alleged unlawfulness." (Emphasis altered.) *Fair Housing Council of San Fernando Valley* v. *Roommates.com, LLC*, supra, 1167–68. Expounding on this interpretation, the court later observed: "A website operator who edits user-created content—such as by correcting spelling, removing obscenity or trimming for length—retains his immunity for any illegality in the user-created content, provided that the edits are unrelated to the illegality. However, a website operator who edits in a manner that contributes to the alleged illegality—such as by removing the word 'not' from a user's message reading '[Name] did *not* steal the artwork' in order to transform an innocent message into a libelous one—is directly involved in the alleged illegality and thus not immune." (Emphasis in original.) Id., 1169.

Similarly, the United States Court of Appeals for the First Circuit interpreted the language of § 230 (f) (3) in *Universal Communication Systems, Inc.* v. *Lycos, Inc.*, supra, 478 F.3d 413. The plaintiff there sought to hold the defendant service provider liable as an "information content provider," in part, under a theory that its website—which contained allegedly false and defamatory postings—did not prevent individuals from using multiple screen names and provided hyperlinks to other websites with objective financial information, thereby

allowing individuals to spread misinformation more credibly. Id., 420. The federal court rejected this theory, explaining that "there is not even a colorable argument that any misinformation was *prompted* by [the defendant's] registration process or its link structure." (Emphasis added.) Id.

Additionally, the United States Court of Appeals for the Tenth Circuit interpreted the language of § 230 (f) (3) in a case involving a defendant that provided access to confidential telephone information through its website. See *Federal Trade Commission* v. *Accusearch, Inc.*, supra, 570 F.3d 1187. The defendant there contended that it was not an "information content provider" because the confidential telephone information it produced for its customers "came originally from the telecommunications carriers" and, thus, "it made nothing new nor brought anything into existence." Id., 1197–98. After addressing the meaning of the words "responsible" and "development," the federal court concluded that "a service provider is responsible for the development of offensive content only if it in some way *specifically encourages* development of what is offensive about the content." (Emphasis added; internal quotation marks omitted.) Id., 1199. According to the court, the defendant met this definition when it "solicited requests for confidential information protected by law, paid researchers to find it, knew that the researchers were likely to use improper methods, and charged customers who wished the information to be disclosed." Id., 1201.

Ordinarily, Connecticut state courts seek guidance from decisions of the United States Court of Appeals for the Second Circuit because they carry particularly persuasive weight in the interpretation of federal statutes. See, e.g., *Rodriguez* v. *Testa*, 296 Conn. 1, 11, 993 A.2d 955 (2010). Although the Second Circuit has not addressed the CDA, several District Courts within the Second Circuit have interpreted § 230 (f) (3). Significantly, they have offered interpretations of § 230 (f) (3) consistent with those of the three Courts of Appeals. See *Doctor's Associates, Inc.* v. *QIP Holder, LLC*, United States District Court, Docket No. 3:06-cv-1710 (VLB) (D. Conn. February 19, 2010) ("[a] reasonable jury may well conclude that the Defendants did not merely post the arguably disparaging content contained in the contestant videos, but instead *actively solicited* disparaging representations about Subway and thus were responsible for the creation or development of the offending contestant videos" [emphasis added]); see also *Federal Trade Commission* v. *LeanSpa, LLC*, 920 F. Supp. 2d 270, 276–77 (D. Conn. 2013); *Ascentive, LLC* v. *Opinion Corp.*, supra, 842 F. Supp. 2d 474–76.

The plaintiff does not challenge the interpretations of the Courts of Appeals, but instead relies, in part, on a series of other cases to support his claim. See *Jones*

v. *Dirty World Entertainment Recordings, LLC*, 840 F. Supp. 2d 1008 (E.D. Ky. 2012); *MCW, Inc.* v. *Badbusinessbureau.com, LLC*, United States District Court, Docket No. Civ.A.3:02-CV-2727-G (N.D. Tex. April 19, 2004); *Woodhull* v. *Meinel*, 145 N.M. 533, 202 P.3d 126 (App. 2008), cert. denied, 145 N.M. 655, 203 P.3d 870 (2009). These cases, however, also track the interpretations of the Courts of Appeals. See *Jones* v. *Dirty World Entertainment Recordings, LLC*, supra, 1012 ("by reason of the very name of the site, the manner in which it is managed, and the personal comments of [the defendant website operator], the defendants have *specifically encouraged* development" [emphasis added]); *MCW, Inc.*, v. *Badbusinessbureau.com, LLC*, supra, United States District Court, Docket No. Civ.A.3:02-CV-2727-G (defendants wrote and created disparaging and defamatory headings, report titles, and messages and "*actively solicit*[*ed*]" other disparaging material [emphasis added]); *Woodhull* v. *Meinel*, supra, 540 ("Instead of merely editing an email from a third party, Defendant *apparently requested* potentially defamatory material for her own stated purpose of 'making fun of' Plaintiff. That material was incorporated into an overall larger posting containing her own thoughts and contributions." [Emphasis added.]).

We conclude that the meaning of "development in part," as defined in case law interpreting the language of § 230 (f) (3), covers conduct ranging from "material contribution" to "solicitation" of the information at issue. See *Fair Housing Council of San Fernando Valley* v. *Roommates.com, LLC*, supra, 521 F.3d 1167–68; *Doctor's Associates, Inc.* v. *QIP Holder, LLC*, supra, United States District Court, Docket No. 3:06-cv-1710 (VLB). The plaintiff has not alleged any actions, individually or in combination, from which to conclude that the defendant "materially contributed," "prompted," "specifically encouraged," "apparently requested," or "actively solicited" the defamatory statements in Buhl's articles. Rather, the actions alleged by the plaintiff are fairly characterized by him to have "amplified," "endorsed," and "adopted" those statements.

It is immaterial whether the defendant amplified, endorsed, or adopted the defamatory statements, because the defendant played no role in their composition. The plaintiff, for example, did not allege that the defendant edited, altered or wrote any of the defamatory statements or any other part of Buhl's articles. He also did not allege that the defendant supervised, communicated or collaborated with Buhl, either before or after the publication of her articles. See *Parisi* v. *Sinclair*, 774 F. Supp. 2d 310, 313, 317 (D.D.C. 2011) (service providers who did not write, contribute to, actively solicit, encourage or communicate with author of allegedly defamatory statements were shielded by § 230); *Barrett* v. *Fonorow*, supra, 343 Ill. App. 3d 1196–97 (allegations that service provider posted alleg-

edly defamatory articles on its website "simply as it found them" not sufficient to overcome protection of § 230).  Likewise, the plaintiff did not allege that the content or title of Carney's article was defamatory.

To the contrary, the allegations address only the defendant's conduct after the actionable statements were conceived, written and published by Buhl. Without more, the allegations do not fall within the meaning of "development in part," as defined in the case law interpreting the language of § 230 (f) (3). As a result, the defendant was entitled to the protection of § 230 (c) (1) because it was not an "information content provider." Accordingly, we reject the plaintiff's challenge to the court's ruling on the motion to strike.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Teri Buhl also was named a defendant in the complaint, but subsequently, the plaintiff withdrew the action as against her. In its brief, the defendant states that its correct name is NBCUniversal Media, LLC. We refer to it in this opinion as the defendant.

[2] As an alternate ground for affirmance, the defendant claims that the plaintiff has not proven as a matter of law that hyperlinking to defamatory statements constitutes publication or publicity, which are common elements underlying all torts in the complaint. The trial court did not reach this issue. Because we affirm the judgment on claims raised by the plaintiff, we need not either.

[3] "We take the facts to be those alleged in the complaint that has been stricken and we construe the complaint in the manner most favorable to sustaining its legal sufficiency. . . . Moreover, we note that [w]hat is necessarily implied [in an allegation] need not be expressly alleged. . . . It is fundamental that in determining the sufficiency of a complaint challenged by a defendant's motion to strike, all well-pleaded facts and those facts necessarily implied from the allegations are taken as admitted. . . . Indeed, pleadings must be construed broadly and realistically, rather than narrowly and technically." (Internal quotation marks omitted.) *Violano* v. *Fernandez*, 280 Conn. 310, 317–18, 907 A.2d 1188 (2006).

[4] "A hyperlink is a highlighted portion of text or an image that, when selected or clicked on by the user, permits the user to go directly from the [website] he or she is currently viewing to a different [website], without first having to enter the domain name of the new [website]." *OBH*, *Inc.* v. *Spotlight Magazine*, *Inc.*, 86 F. Supp. 2d 176, 181 (W.D.N.Y. 2000).

[5] In the complaint, the following statements were alleged to be defamatory: (1) "[The plaintiff] was ordered to stay out of the Forex biz for five years but he quickly integrated himself into another Forex shop that had some trouble with regulators called GFX Group."
(2) "There is a forexsignals.net trading platform listed as a domestic LLC under Pamela's name in 2009 but it's unclear if this is a front for Vazquez. . . . Given his history of SEC and CFTC trading limitations I have to wonder if Pamela is also now a forex broker or is just holding the license for her boyfriend. What a great match that would be."
(3) "[The plaintiff] was ordered to stay out of CFTC-regulated businesses in the U.S. for five years, which included not being allowed to do forex transactions with a U.S. Citizen regardless of the country it cleared in, but he quickly integrated himself into another Forex shop (Swiss Headquartered) that had some trouble with regulators in London called GFX Capital. Swiss registration records show he's a director there."
(4) "In early 1996 [the plaintiff] was also sued for fraud by the SEC while a trader for Bankers Trust; for lying to their clients about the value of some derivative contracts the bank created and he sold." (Internal quotation marks omitted.)

[6] The first count, not at issue here, alleged a per se defamation claim against Buhl. The fifth count, later stricken without opposition, alleged a claim for a permanent injunction.

[7] "A number of state and federal courts have applied the Restatement rule that a false light invasion of privacy occurs if '(a) the false light in which

the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.' 3 Restatement (Second), Torts § 652E [1977] . . . ." (Citations omitted.) *Goodrich* v. *Waterbury Republican-American, Inc.*, 188 Conn. 107, 131, 448 A.2d 1317 (1982).

[8] We recognize that putting our interpretation into practice has the potential to create harmful results. Consider, for example, *Barnes* v. *Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009). There, the defendant interactive computer service provider was protected by § 230 (c) (1); id., 1105; even though it failed to remove from its website nude photographs of the plaintiff, posted without her authorization, by her former boyfriend. Id., 1098–99. Although not all cases have to accommodate such harsh results, it is the sting behind cases like *Barnes* that can make faithful interpretation of statutes difficult. Without further legislative action, however, there is little we can do in our limited role but join with other courts and commentators in expressing our concern with the statute's broad scope.

"Congress has granted providers and users of interactive computer services total immunity under the CDA. . . . This license is clearly subject to tremendous abuse, and the Court has serious misgivings about this Circuit's broad interpretation of § 230 immunity. The prospect of blanket immunity for those who intentionally redistribute defamatory statements could have widespread and potentially catastrophic consequences for individuals and entities alike. Nevertheless, under the CDA the Court's hands are tied." *Directory Assistants, Inc.* v. *Supermedia, LLC*, 884 F. Supp. 2d 446, 453 (E.D. Va. 2012); see also *Global Royalties, Ltd.* v. *Xcentric Ventures, LLC*, 544 F. Supp. 2d 929, 933 (D. Ariz. 2008). The Internet is no longer the burgeoning medium that it was in 1996. See *Zeran* v. *America Online, Inc.*, supra, 129 F.3d 330. We question whether the main policy reasons underlying the original enactment of § 230 remain relevant. Nevertheless, the language of § 230 compels us to reject the plaintiff's theory of liability unless and until Congress amends the statute.